[No. 21048. Department Two. April 2, 1928.]

# MARYLAND CASUALTY COMPANY, *Appellant*, v. PHILBRICK & NICHOLSON, INCORPORATED, *et al., Respondents.*[1]

[1] ASSIGNMENTS (6)— COUNTIES (46)— RIGHTS OF ACTION — CONTRACTS—LABORERS' CLAIMS AGAINST CONTRACTOR'S BOND. The claims of laborers and materialmen for pay on a highway construction contract are assignable to a bank advancing money to pay such claims, and may be enforced against the bond of the contractor.

[2] COUNTIES (46) — CLAIMS AGAINST CONTRACTOR'S BONDS — CONSTRUCTION OF ACT. The right of laborers, mechanics, subcontractors and materialmen against the fund due the contractors on public work, is not precluded by the proviso in Rem. Comp. Stat., § 1159, that the act shall not apply to money loaned a public contractor in the performance of his work.

[3] COUNTIES (46)—CLAIMS AGAINST CONTRACTOR'S BONDS—ASSIGNMENT. The fact that a bank purchases laborers' claims against a public contractor does not contravene the proviso of Rem. Comp. State., § 1159, that "money loaned or advanced to any such contractor, subcontractor or other person in the performance of any such work" shall not be enforceable against such bond.

[4] PLEADING (118)—AMENDMENT OF ANSWER. The allowance of an amendment to an answer to a complaint so as to correct an obvious mistake cannot be urged as error.

[5] STATES (20) — CONTRACTS — CONTRACTOR'S BONDS — RIGHTS OF CONTRACTOR AND SURETY—RESERVE FUND. Under Rem. Comp. Stat., § 10320, providing a reserve fund on state public improvement contracts for the protection of certain beneficiaries who provide materials or perform labor thereon, the surety on the contractor's bond has no recourse against the contractor or the state on account of the expenditure of the fund in payment of lawful demands for labor and material expended under the contract.

[6] APPEAL (386)—REVIEW—PARTIES ENTITLED TO ALLEGE ERROR — WAIVER. Error in the allowance of an excessive rate of interest on sums due a litigant cannot be urged on appeal, where the party to whom it was allowed files a written waiver of all sums in excess of the statutory rate.

[1]Reported in 266 Pac. 142.

[7] APPEAL (468)—REVIEW—HARMLESS ERROR—ALLOWANCE OF AT-
TORNEY FEES. The allowance of a larger sum for attorney fees
than claimed by a party does not constitute error, since, under
Rem. Comp. Stat., § 1161, the amount recoverable is left to the
judgment of the court.

Appeal from a judgment of the superior court for
Thurston county, Wright, J., entered September 21,
1927, in favor of the defendants, in an action to deter-
mine the liability of a surety on a state highway con-
tract. Affirmed.

*Roberts & Skeel* and *Elwood Hutcheson*, for appel-
lant.

*W. H. Abel* and *Troy & Yantis*, for respondent
Montesano State Bank.

FULLERTON, J.—In May, 1926, the defendant, Phil-
brick & Nicholson, Inc., a corporation, entered into a
contract with the state highway commission of the
state of Washington for the completion of a part of
state road No. 9, lying and being between Agnew and
Port Angeles, in Clallam county. The contract is not
in the record, and we are not advised as to its precise
terms. Enough does appear, however, to show that
it was in form that usual in such cases; the contractor
agreed to furnish the necessary labor and material,
and grade and hard-surface the road in accordance
with plans and specifications adopted by the highway
department of the state. The contract was of con-
siderable magnitude. The estimated contract price
seems to have been $179,833.12. The work was sub-
stantially performed by the contractor, and was ac-
cepted by the state after making some deductions in
the contract price for minor portions of the work re-
maining uncompleted; the allowance made by the state
to the contractor being $178,617.05.

On entering into the contract, the defendant gave a bond to the state of Washington, in the penal sum of $179,833.12, with the appellant, Maryland Casualty Company, as surety; the bond being in the following form:

"KNOW ALL MEN BY THESE PRESENTS, That Philbrick & Nicholson, Inc., a corporation, existing under and by virtue of the laws of the state of Washington, of Tacoma, Washington, as Principal, and MARYLAND CASUALTY COMPANY, as Surety, are jointly and severally held and bound unto the state of Washington, in the penal sum of One Hundred and Seventy-Nine Thousand Eight Hundred Thirty-three and 12/100 Dollars ($179,833.12), for the payment of which we jointly and severally bind ourselves, our heirs, executors, administrators and assigns, and successors and assigns, firmly by these presents.

"THE CONDITION of this bond is such that, whereas, on the 3d day of May A. D., 1926, the said Philbrick & Nicholson, Inc., Principal herein, made and entered into a certain contract with the state of Washington, by the terms, conditions and provisions of which contract the said Philbrick & Nicholson, Inc., Principal herein, agree to furnish all material and do certain work to-wit: That it will undertake and complete the construction of a portion of state road No. 9, between Agnew and Port Angeles, Federal Aid Project No. 138-B, in Clallam County, Washington, between Station 535-90 and Station 869-50, as per maps, plans, and specifications made a part of said contract which contract as so executed is hereunto attached, is now referred to and by reference is incorporated herein and made a part hereof as fully for all purposes as if here set forth at length.

"Now, THEREFORE, If the Principal herein shall faithfully and truly observe and comply with the terms, conditions and provisions of said contract in all respects, and shall well and truly and fully do and perform all matters and things by it undertaken to be performed under said contract upon the terms proposed therein, and within the time prescribed therein,

and shall indemnify the state of Washington against any direct or indirect damages that shall be suffered or claimed, for injuries to persons or property during the construction and improvement of such highway, and until the same is accepted, and shall pay all laborers, mechanics, sub-contractors and material men, and all persons who shall supply such contractor or sub-contractor with provisions and supplies for the carrying on of such work, and shall in all respects faithfully perform said contract according to law, then this obligation to be void, otherwise to remain in full force and effect.

"WITNESS OUR HANDS this 3rd day of May, 1926.
PHILBRICK & NICHOLSON, INC. (SEAL)
By C. E. Philbrick,
P. O. Nicholson, Secy-Treas.
MARYLAND CASUALTY COMPANY,
By A. Van R. Schermerhorn,
Surety Attorney in Fact (SEAL)
Address of Local Office
and agent of Surety Co.
Hansen & Rowland, Inc.,
Gen. Agents,
201 Washington Bldg.,
Tacoma, Washington.
"Approved as to form May 4th A. D., 1926.
"Tom W. Holman, Assistant Attorney General
"Approved as to execution by surety (No responsibility assumed for forgery)
May 1, 1926
"H. O. Fishback, Insurance Commissioner.
"Approved, R. H. HARTLEY, Governor."

In September, 1926, during the progress of the work, the contractor became unable to meet its current expenses for labor, and applied to its bondsman, through its agents Hansen & Rowland, for relief. It appears that, in its application made to the bonding company to become surety upon its bond, the contractor had agreed not to mortgage or otherwise pledge its working equipment while the contract was in force. It is

inferable, also, that it had theretofore applied to the respondent, Montesano State Bank, for funds for the purpose of meeting its labor obligations, and had been met with this restrictive clause in the application. The result of the conference with the agents was a consent in writing to placing a chattel mortgage on the equipment to the bank as security for $15,000.

The contractor then made another application to the respondent bank for a loan. The bank desired the additional security of the bond for the repayment of any loan it should make to the contractor, and submitted the matter to its counsel as to the method of procedure to secure this end, and to draw the necessary contracts. Its counsel at once advised it that, under the statutes of the state, they could have no lien or claim against the bond for money loaned or advanced to the contractor, even though the money loaned or advanced was used solely in the prosecution of the contract work.

Another expedient was then adopted. It was agreed that the bank should purchase the individual accounts of the workmen on the regular pay-days, take an assignment of the accounts, and itself file a claim against the bond. This scheme was subsequently carried out. On the regular pay-days, the contractor made a list containing the names of each individual workman and the amount earned by him, and forwarded the list to the bank. The bank then drew a check on itself payable to the workman, and forwarded it to some bank or person near the place of work with a form of assignment. When the workman signed the assignment, delivery was made to him of the check drawn in his favor. Some seventeen different payments were made in this manner; the first on September 25, 1926, and the last on December 23, of the same year. The totals aggregated $13,529.37. At the time of each several

payment, the respondent bank filed a statement of the amount paid with the state highway commission, making a claim against the contractor's bond for the amount. The commission, at the time of the receipt of each several claim, acknowledged its receipt in writing, stating the amount of the claim, the name of the contractor, the name of the bondsman, and the fund against which the claim was made, and sent a copy of its acknowledgment to the contractor and to the bondsman.

The contractor incurred obligations to numerous persons furnishing materials and supplies to it, aggregating a large sum. These persons likewise filed claims against the bond. There was due the state from the contractor, also, the sum of $323.46 as premiums payable under the workmen's compensation act. To meet these obligations, there remained in the hands of the commission the percentage it had withheld from the contractor, under the statutory requirement that it withhold from the payments due the contractor fifteen per cent of the contract price for the benefit of persons performing labor for the contractor on the work, and persons furnishing him with materials and supplies. The sum the state retained for this purpose was $22,081.66. All of the remaining amounts earned had been disbursed from time to time to the contractor.

The present action was instituted by the appellant, Maryland Casualty Company, to have its liability upon its bond determined, and to have the fund in the possession of the state applied to the unpaid obligations. To its action, it made parties defendant, the state of Washington and all of the persons, firms and corporations who had filed claims against its bond. In its complaint, it admitted its liability in some amount to all of the claimants (except the respondent Montesano State Bank), and sought only to have the amounts for

which it was liable determined. As to the claim of the respondent, it denied liability *in toto*.

Between the time of the commencement of the action and the time of its final adjudication, the appellant settled with and paid all of the claimants except the respondent, paying in that behalf sums aggregating an excess of $45,000. The question of its liability to the respondent bank was tried out by the court, resulting in a judgment in favor of the respondent for the amount it had paid in the purchase of the laborers' claims. During the course of the trial, a controversy arose between the appellant and the state, which the court determined in favor of the state. Whether the trial court erred in its judgment in these particulars, is the question presented by the appeal.

[1] As against the judgment in favor of the bank, the appellant makes a number of contentions. The first is that the bank acquired no right of action against the bond, or claim to the fund withheld by the state, by the assignment to it of the laborers' claims. It concedes, of course, that the laborers themselves had such a claim, and that, had they perfected it by filing a claim with the proper officers, the assignment would have passed all of their rights to the assignee. But they argue that the right to claim against the bond and the reserve fund is the personal right of the laborers, not assignable before it is perfected, and that the bank acquired by the assignments at the time it took them nothing more than a right to claim against the principal debtor.

But the question, we think, has been foreclosed by our prior decisions. It is true that in the case of *Dexter Horton & Co. v. Sparkman,* 2 Wash. 165, 25 Pac. 1070, where the assignee of a claim for wages sought to protect it by filing a mechanic's lien on property on which his assignor had a right to lien, we

held that he was not entitled so to do, giving as a reason that "the lien given by the statute is personal to the laborer," and "does not run with the chose in action." And true that, in the later case of *Casey v. Ault,* 4 Wash. 167, 29 Pac. 1048, we announced our adherence to the same doctrine, holding, however, that the rule was not applicable to the particular case, as there the lien had been perfected by the filing of the notice prior to the assignment, and that the "assignment of the claim entitles the assignee to the benefit of the security." But in the subsequent case of *Gilmore v. Westerman,* 13 Wash. 390, 43 Pac. 345, we refused to apply the rule to an instance similar to the one now before us. In that case, certain persons entered into a contract with a county to erect a bridge. Pursuant to the statute requiring it, the contractors gave a bond to the county conditioned to pay all laborers, mechanics and materialmen furnishing labor and material necessary to be used in the construction of the bridge. Certain persons furnishing material for the bridge, who were not paid by the contractor, assigned their claim, and the assignee sought to recover against the bond. Among the contentions made, as barring the right of recovery, was the contention that the right to claim against the bond was a personal right of the person furnishing the material, and that an assignment of the claim did not pass to the assignee a right to claim against the bond. Answering this contention, we said:

"Is a material-man's right of action on the bond assignable, is the next question. Under the broad and comprehensive provisions of our code, we think it can hardly be doubted that it is, and it has been so decided, under analogous statutes, by other courts. *Sepp v. McCann,* 47 Minn. 364 (50 N. W. 246); *City of St. Paul v. Butler,* 30 Minn. 459 (16 N. W. 362); *Peters v. St. Louis, etc., R. R. Co.,* 24 Mo. 586. Those cases proceed

upon the well known principle that the bond is security for the debt, and that the assignment of the debt carries the security with it."

The question was again before us in the still later case of *Northwestern Nat. Bank v. Guardian Casualty & Guaranty Co.*, 93 Wash. 635, 161 Pac. 473. In that case, the assignment was of labor and materialmen's claims for labor performed and materials furnished in the prosecution of a public work; the contractor had given the statutory bond conditioned for the payment of such claims. The contention was there made that the assignment of the claims did not pass to the assignee the right to claim against the bond. Passing upon the objection, we said:

"It is next urged that the assignment of these labor and material claims, in any event, carried no right to assert them against the bond. It is argued that the right of the laborer or materialman is merely a right to receive his pay under the express or implied contract with the contractors, and that this is all the right he has by virtue of his contract; that, therefore, the assignment of the time checks was only an assignment of a right of action against the contractors. This view is too narrow. It is only by virtue of his right to receive his pay from the contractor that the laborer or materialman has any right assertable against the bond as a contract made for his benefit. His right against the bond is ancillary to and dependent upon his right against the contractors. The first right is dependent upon the second. An assignment of the second, therefore, operates as an equitable assignment of the first. *Gilmore v. Westerman*, 13 Wash. 390, 43 Pac. 345."

It may be that, in principle, there is no valid distinction with respect to the rights acquired by assignment between claims enforcible against property by laborers and materialmen under the mechanic's lien law and a claim of laborers and materialmen under

the statute now in question. But if this be so, our later cases must be held as overruling the first. The rule has been too long upon the books to be changed without materially affecting the rights of persons who have acted on the faith of it. It is worthy of notice, also, that the legislature has changed the rule with respect to mechanic's liens as we formerly announced it. Now, by the express terms of statute, an assignee of claim of a laborer or materialman who has a right of lien for labor performed or materials furnished under the statute relating to mechanic's liens may himself perfect the lien and foreclose it in his own name and in his own right.

[2] The second objection to the judgment is based upon a change in the statute relative to bonds of contractors upon public works, made subsequent to the decisions of this court above cited. Prior to the legislative session of 1915, the statute required such contractors to furnish a bond conditioned to

". . . faithfully perform all of the provisions of the contract, and pay all laborers, mechanics and subcontractors and materialmen, and all persons who shall supply" the contractor "or sub-contractor with provisions and supplies for the carrying on of such work," and pay "all just debts, dues and demands incurred in the performance of such work . . ." (Rem. & Bal. Code § 1159).

At its session in the year named, the legislature amended the statute by omitting therefrom the clause last quoted and by adding thereto the following clause:

"Provided, however, that the provisions of this act shall not apply to money loaned or advanced to any such contractor, subcontractor or other person in the performance of any such work." (Rem. Comp. Stat., § 1159) [P. C. § 9724.]

In explanation of the change, it may be noted that this court, in *Puget Sound State Bank v. Gallucci,* 82 Wash. 445, 144 Pac. 698, allowed a bank to recover against the bond of a public contractor for money advanced to the contractor, and that the amendment of the statute was enacted at the session of the legislature immediately following the decision, possibly as a result of the decision. But if this be the reason for the change, it was due to a misconstruction of the decision. The court did not there hold that, under the statute as it then existed, a person loaning or advancing money to a contractor, even though the money loaned or advanced was used by the contractor in the prosecution of the contract work, could recover against a bond conditioned as the statute required, but held that a recovery could be had in the particular case because the bond contained conditions in addition to the statutory requirements, and that these furnished a basis for the recovery. This we pointed out in the subsequent case of *American Sav. Bank & Trust Co. v. National Surety Co.,* 104 Wash. 663, 177 Pac. 646, where a recovery for advancements was sought on the statutory bond and denied. In its practical effect, the change in the statute was without result in so far as it applied to the particular question. Neither before nor since it was made has it been the rule that a person advancing money to a public contractor could recover against the contractor's bond, where the bond was conditioned solely as the statute required. In our opinion, therefore, the statute requires no change in the rule as announced in the cases of *Gilmore v. Westerman,* 13 Wash. 390, 43 Pac. 345, and *Northwest National Bank v. Guardian Casualty & Guaranty Co., ubi supra.*

[3] The appellant next contends that the transaction itself, the purchase of the laborers' claims by the respondent, was in its substance and effect a loan

or an advancement of money by the respondent to the contractor, and is for that reason within the ban of the statute. The facts of the transaction, with an exception presently to be noticed, we have hereinbefore outlined. It will be remembered that the respondent made no actual loan or advancement of money to the contractor. The money for which it now makes claim was all paid directly to the workmen employed on the work, and in the purchase of obligations then due them from the contractor. The transaction was, doubtless, of direct benefit to the contractor, as it enabled it to carry on the work and complete the contract, which otherwise it might have been compelled to abandon. It is possible, too, that one of the inducing causes for the purchases was the regard which an officer of the respondent had for the principal stockholder of the contractor, and it was, no doubt, through the negotiations of this stockholder that the arrangement for the purchase of the claims was made. But these considerations do not change the nature of the transaction.

The evidence is direct and positive that the respondent, on the advice of its counsel, refused to make a loan or an advancement to the contractor, and only resorted to a purchase of the claims after it had been advised that it would have for their payment the surety afforded by the bond executed by the appellant in addition to the obligation of the contractor. There is evidence in the record, also, that the transaction was fully explained to the general agents of the appellant, and received their consent and approval before any purchases of the claims were made. True, the agents deny this, and true also, that they deny authority from their principal to consent to any such arrangement. The matter is not vital, and, as the conversation concerning it was over the telephone, there is room for a misunderstanding as to its precise purport. It is mentioned

here as a further evidence of the respondent's good
faith. Certain it is that the agents and representatives
of the respondent were led to believe that its con-
templated conduct had the approval of the appellant.
Nor had the respondent any reason to doubt the au-
thority of the agents. It was through them that the
bond was negotiated and issued. Their names were
indorsed thereon as general agents, and they had pur-
ported to act in other matters, seemingly as far,
without the authority of a general agent as was this
matter.

The respondent, in its agreement to purchase the
claims, exacted the written promise of the contractor
for the repayment of the sums expended for that pur-
pose, and demand notes were taken from the contractor
for the amount expended for each several purchase.
It is urged that this fact prevents a recovery against
the bond, even though the other objections urged be
not maintainable. But there was a written agreement
entered into, at the time that the respondent agreed
to purchase the claims, that notes for the amount of
each several purchase should be given by the contractor
to the respondent; and it was expressly recited therein
that such notes should not be treated as payment of
the claims, but as collateral thereto. The notes also
contained the recital that "this note is not taken in
payment of the claims, but as collateral thereto."
Manifestly, it seems to us, that the taking of the notes
did not operate as a release of appellant's obligation
on its bond. We have not overlooked the argument
to the effect that the notes had an ulterior purpose,
namely, the purpose to deceive the state bank examiner,
and that the whole scheme was fraudulent. But this
is hardly a warrantable conclusion. The contract was
kept on file by the bank with the other papers relating

to the matter, and the notes themselves bore on their face a sufficient notice of their real purpose to excite inquiry. We prefer to think that the acts of the officers of the bank were honest rather than dishonest, and that their purpose in taking the writings was to inform the bank examiner of the real purpose of the transaction, not to deceive him concerning it.

The controversy between the appellant and the state arises out of these circumstances: It is the practice of the state to purchase the cement necessary to be used in road construction, and sell it to the contractor at cost; the purpose evidently being to secure a uniform grade and quality of cement used in road construction. It was the practice to deduct the cost of the cement used out of each several estimate made to the contractor. From the first estimate made the contractor in this instance, there was due the state for cement used $5,625. The state, through an error on the part of some accounting officer, deducted only for this purpose $1,625, making an overpayment of $4,000. The error was carried through all of the subsequent estimates, and was not discovered until after the trial of the cause was entered upon. In its answer to the appellant's complaint, the state admitted that it had on hand the full amount of the percentage it was required by statute to retain out of the contract price, namely, $26,405.12. After discovering the mistake, it asked and was granted leave to so amend its answer as to show the exact amount it had retained, viz., $22,405.12, and to further show that the last estimate made the contractor, $7,000, was paid not to the contractor, but to the appellant.

[4] The amendment to the answer was allowed over the appellant's objection, and it assigns error thereon. Mistakes in pleadings as to errors in sums

of money are of no greater consequence than are errors
in other matters, and we see no more reason why a liti-
gant should be bound by an obvious mistake in this
particular than it should be bound by an obvious mis-
take in any other. One of the purposes of all trials is
to ascertain the truth, and an admission, not the truth,
should never be held controlling, unless it involves
some element which it would be unconscionable to per-
mit the party making it to gainsay or deny. Nothing
of this sort enters into the admission made here, and
we cannot conclude that the court erred in allowing
an amendment.

[5] The more important question is, whether the
court erred in allowing the deduction. By the express
terms of the statute (Rem. Comp. Stat., § 10320) [P.
C. § 9727-1], the state, on contracts for public improve-
ments, is obligated to reserve from the estimates made
to the contractor of moneys earned during the progress
of the work, fifteen per cent of the amount thereof,
for the protection of certain named persons as bene-
ficiaries. The statute declares the fund reserved to be
a trust fund, and that it shall in no event be paid the
contractor until a lapse of thirty days after the com-
pletion and acceptance of the work, and then only when
the claims against the fund are satisfied. Plainly,
therefore, the state is not permitted to pay the fund,
either mistakenly or otherwise, to the contractor, if
the payment operates to the injury of any person for
whose benefit it is reserved. The beneficiaries named
in the statute are

" . . . person or persons, mechanic, subcon-
tractor or materialman who shall perform any labor
upon such contract or the doing of said work, and
all persons who shall supply such person or persons
or subcontractors with provisions and supplies for the
carrying on of such work."

Obviously, these designations do not include the surety on the contractor's bond, and the surety's right to the fund can rest only in the equitable principle of subrogation. When the surety in this instance resorted to equity to marshal the funds, it became bound by equitable rules and principles, and it cannot complain of the state's action, unless the action operated to its injury. Here, there was no injury. While the evidence in the record on the question is somewhat meager, it shows, as we read it, that the overpayment was expended by the contractor in the prosecution of the work, and shows, furthermore, that the sum due the contractor on the final settlement, some $7,000, was paid directly to the bondsman. Manifestly, we think, it has been caused no loss by the mistake.

[6]  The court, in its judgment, allowed interest on the claims from the time of their purchase until the time of the judgment at the rate of eight per cent per annum, instead of the statutory rate of six per cent. We are advised in the arguments, however, that the respondent has filed in the court below a written waiver of all claims for interest in excess of the statutory rate. In view of this remission, no reversal is required because of the original error.

[7]  There is a contention that an excessive attorney fee was allowed. This contention has its basis in the fact that a greater sum was allowed than was stated in the claims filed against the bond. This difference seems to arise because, on certain of the claims filed, there was a claim for an attorney's fee, while in others there was not. But the matter is not controlling. By the terms of the statute (Rem. Comp. Stat., § 1161) [P. C. § 9727], no attorney fees are recoverable unless a suit or action is necessary to enforce the claims, and then the amount recoverable is left to the judgment of the court. It must follow that the

statement in the claims of the amount of the attorney fee demanded added nothing thereto, and was wholly a useless action. The fees allowed by the court were reasonable, and its judgment in this respect is without error.

The contractor was indebted to the state for industrial insurance premiums. It is conceded that the state was entitled to deduct the amount due from the reserve fund, but it is contended that the amount deducted is too large. The evidence on the question is, to our minds at least, not clear, but enough does appear to show that the difference between the parties is inconsequential. We see no reason, therefore, for disturbing the judgment on this ground.

The judgment will stand affirmed.

MACKINTOSH, C. J., MAIN, TOLMAN, and ASKREN, JJ., concur.