## STATE BANK OF WHEATLAND v. TURPEN, ET AL.

(No. 1838; June 26, 1934; 34 Pac. (2nd) 1)

For the appellant there was a brief by *Kinkead & Pearson,* of Cheyenne, Wyoming, and an oral argument by *Mr. Kinkead.*

BLUME, Justice.

This is an action brought by the State Bank of Wheatland, a corporation, hereinafter referred to as the bank, against James F. Turpen and the Fidelity and Deposit Company of Maryland, a corporation, the latter hereinafter being referred to as the Surety or the Surety Company. The court entered judgment against the Surety Company for the sum of $13,304.56, and judgment against Turpen for a somewhat larger amount, and from the judgment so entered the Surety Company has appealed.

On July 2, 1929, Turpen entered into two contracts with the State of Wyoming for the construction of a bridge over Wind River on the Wind River-Shoshoni road. One was for the sub-structure, and the other for furnishing and erecting structural steel for a steel truss over the river. The latter is not in controversy

in this case, except incidentally. The contracts provided for monthly estimates and payments as the work progressed, 15% of the estimates to be retained until the work was fully completed; that before making final payment, the State Highway Commission should require the contractor to show that all debts were paid; that a notice should be given of the completion of the work and that the final estimate and the 15% retained should not become due and payable until after that time. Turpen gave a bond in the usual form, pursuant to Sec. 95-201, Rev. St. 1931, with the Fidelity and Deposit Company of Maryland as surety, which provided that it should be for the use of the obligee as well as for the use and benefit of all persons performing work or labor or furnishing any material in the execution of the contract, and that all labor and material furnished for the work should be paid. The surety had no assignment of the money arising under the contract and no agreement how it should be applied. Nor does our statute make any provision therefor, at least in specific terms. The contract was completed some time during the summer of 1930 and due notices of the claimants for work and material were filed. There is no controversy in this case as to the sums involved in the final estimate and the 15% retained by the state pursuant to the contract.

Prior to the commencement of the work, Turpen, who was unable to finance the project, made an arrangement with the State Bank of Wheatland, plaintiff herein, through Mr. Brice, its president, that money should be loaned him from time to time so as to be able to carry on and complete the work. It was thought at that time that Turpen would make a profit out of the contract in the sum of approximately $15,000. Brice agreed to make these loans, provided, however, that the bank would be made secure. He loaned Turpen, commencing with July 25, 1929, up to and including

January 10, 1930, the total sum of $23,500. The proceeds thereof were apparently all used on the contract in question. In addition thereto, the plaintiff took an assignment of the claim of the Colorado Builders' Supply Company, which furnished steel for the work in question, amounting to the sum of $5482.55 less $1132.78 paid thereon, and the balance due on that claim constitutes the first cause of action herein. Plaintiff also took five different assignments of claims of the Shoshoni Lumber Company for cement, lumber and other material furnished for the work. These claims are sued on in the second cause of action herein, and in the aggregate amount to $8159.77 less $999.52 paid thereon.

The State made certain payments to Turpen as the work progressed. Warrants were issued for them. Most of them were deposited in the plaintiff bank and credit given Turpen therefor. Two of them were issued directly to the bank. The others were sent directly to the bank and endorsed by Brice as agent for Turpen. The total amount of warrants thus deposited in the bank was the sum of $50,148.71, which, however, included $22,818.33 paid on the second contract herein, not in litigation here. Three of the loans made to Turpen by the bank, in the sum of $4500, principal, were, in the fall of 1929, charged to the borrower by debiting his account therewith. At the same time the debtor was also charged with a note of $521.65, on account of a loan made to him before the making of the contract in question herein. The other loans made by the bank, in the principal sum of $19,000, were paid out of the warrant of $22,818.33 above mentioned. The remainder of the money placed to Turpen's credit as above stated was checked out by him from time to time. All of it apparently was disbursed for labor and material under the contract in litigation except the note of $521.65 already mentioned, the sum of $2962.00

for machinery, apparently used in connection with the contract, and the sum of $861.93, used by Turpen for his personal needs.

The defendant surety company pleaded payment, and that the plaintiff bank was seeking to split an entire cause of action originally held by the Shoshoni Lumber Company. This will be mentioned more in detail later, and other facts will be mentioned in connection with the discussion of points of law arising thereunder. It may be mentioned here, before proceeding further, that counsel for the surety company complains of the inadequacy of some of the evidence in connection with the assignments from the Shoshoni Lumber Company and the exhibits in connection therewith, and of some inconsistencies apparently exhibited therein. It would do no particular good to enter into a discussion in reference thereto. We have examined the various exhibits and papers connected therewith with care and have found that the items and amounts included in the various assignments have been shown with reasonable certainty. We shall, accordingly, proceed at once to the discussion of the legal principles involved in this case, and the facts in connection therewith.

1. The defendant pleaded, and it appears in the record that the Shoshoni Lumber Company, assignor of the plaintiff herein, on January 17, 1931, instituted an action against the defendants herein, for the sum of $1060 for goods and merchandise sold to the defendant Turpen in connection with the construction of the bridge referred to herein, and that a judgment was entered in that action in favor of the Lumber Company on July 6, 1932. It is claimed that the items embraced in that action, as well as the amounts assigned to plaintiff bank and sued on herein, were part of the same running account which the Lumber Com-

pany had against Turpen, and that accordingly two suits, each for part thereof, violates the rule against splitting a cause of action. The witness Cox, manager of the Lumber Company, testified that the company had but one account against Turpen, commencing in the month of July, 1929, and ending April 7, 1930, part of that account being involved in the suit brought by the Lumber Company, the remainder in the case at bar; that the items involved in the two actions are however "entirely separate"; in other words, that those involved in the case at bar were not involved in that suit. The defendant Turpen testified that in July, 1929, he made arrangements with the Shoshoni Lumber Company for the purchase of the various supplies needed in connection with the bridge, and that the prices quoted were satisfactory to him; that he immediately bought two car loads of lumber, the remainder, including the cement, at various times as it was needed; that he would go and get the material from day to day and sometimes oftener; that the cement was bought on 10 days' time; that it was understood that he should settle for the other materials every thirty days, and if he did that, he would get two per cent discount. It may be that under the foregoing evidence, standing by itself, we should be forced to the conclusion that the whole account rested upon the agreement between the parties made in July, 1929, and that this was, in fact, the only agreement made. And if there were no other evidence, it may be that we would be compelled to hold with the defendant, at least as to the major portion of the account. But it appears that during the progress of the work, certain accounts were individualized by the Lumber Company and Turpen, and set apart by themselves, as shown by the assignments made to plaintiff bank. And while the rule of splitting a cause of action cannot be evaded by making partial assignments (1 C. J. 1110), nevertheless the rule exists for

the benefit of the debtor, and he can waive it. 1 C. J. 1108, 1109. There can be no doubt in this case that Turpen waived the rule. He did not set it up in this case, nor would he have been permitted to do. so. He had the right to make a contract in the first instance, individualizing the accounts in the manner in which it was done subsequently, when the assignments to the plaintiff were made. In that case the defendant could not have complained. Thus individualizing the accounts could not have prejudiced it. And if Turpen had the right to do so in the first instance, it would seem that it must logically follow that he had a right to do so subsequently either by direct agreement to that effect or by what may be called ratification, at least if no greater burden would thereby be placed upon his surety than in the case where his agreement had been made in the first place. And no greater burden is perceived. It would seem that the defense here set up is one that is personal to Turpen, the principal, and since he has waived it, the surety cannot set it up. 50 C. J. 194-195; 21 R. C. L. 999.

2. As heretofore stated, the first cause of action is based on an assignment of the claim of the Colorado Builders Supply Company, which in August, 1929, furnished steel for the work in question in the amount of $5482.55. Part of this included freight, which was paid by Turpen, leaving the amount due to the seller the sum of $4349.77, the amount in suit herein. The bank remitted the amount of the bill, less freight charges, to the seller, taking an assignment of the account, as well as a receipt, and requesting that the latter be sent to Turpen, so that he could file it with the Highway Department and receive credit therefor in the next following estimate. Turpen filed the receipt, and in the estimate of August 31, 1929, was allowed for the steel at the contract rate, and this amount, less fifteen per cent retained, was included in the warrant issued upon

that estimate, pursuant to a claim, under oath, filed by Turpen. The total warrant issued was in the sum of $7547.56, which included the sum of $5049.62 for the steel above mentioned, and which, pursuant to an assignment made by Turpen, was issued and sent directly to the bank.

In connection with the second cause of action, involving accounts bought from the Shoshoni Lumber Company, it appears that the latter company made assignments to the plaintiff bank, on the dates shown thereon. It gave these assignments to Turpen. The latter forwarded them to the bank, and the bank thereupon sent a check to the Lumber Company. At the same time that the assignments were given, Turpen also gave his individual check, with the understanding, as the evidence shows, that these checks should be returned when the bank should send its check in accordance with the assignments made to it. The accounts were then marked paid. One of the assignments, for $1535, was for 2000 bags of cement bought in July, 1929. The receipt for this was filed with the state, with the knowledge, it seems, of the bank, and an allowance of $1585, less 15% thereof retained, was made to Turpen in the July estimate of $1491.75, the warrant for which was issued to Turpen and was deposited in the plaintiff bank. Apparently another item of cement was dealt with likewise. The situation in connection with these items of cement is, accordingly, similar to the situation in connection with the steel bought from the Colorado Supply Company. Various contentions are made by reason of these facts, and we shall proceed to consider them separately.

(a) In the first place, it is claimed that the bank, by these transactions, in fact made loans to Turpen and paid the material men, and that such loans are not covered by the bond given by the surety company herein. The conclusion, doubtless, is correct, if the

premises are. It does not seem to be questioned that the accounts for labor and material furnished in connection with the contract herein were assignable, giving the assignee the same rights as the assignors. And it has been so held. Maryland Casualty Co. v. Philbrick and Nicholson, 147 Wash. 277, 266 Pac. 142, 145. Whether or not a transaction constitutes payment depends, it is said, largely upon the intention of the parties. 48 C. J. 586-587. There was evidence in this case indicating definitely that the bank did not intend to pay the amounts in controversy, but intended to become an assignee thereof. The trial court impliedly found that to be true, and with that finding we cannot interfere. The plaintiff bank, accordingly, has a *prima facie* legal right upon which it is suing (Third National Bank v. Fidelity and Surety Company, (C. C. A.) 65 F. (2d) 548), and that legal right must prevail, unless it is defeated upon some valid legal or equitable ground.

(b) It is claimed that Turpen would not have received an allowance for the steel and the cement heretofore specifically mentioned except for the filing of the receipts therefor, and that the "connivance on the part of Brice" to have these filed, "contemplated and in fact involved Turpen in a violation of his contract." We have, however, not been able to discover wherein the contract was violated by reason of the facts herein shown. The evidence shows that the steel and the cement for which allowance was made by the state was on the ground at or near the bridge, and all finally went into the work undertaken by Turpen. An agent of the State Highway Commission, it is true, testified that no allowance would have been made for these items, at the time that they were made, if it had not been for the receipts which were filed with the commission. In fact, Turpen thought the same. But that can have no weight as against the contract in the case

at bar. It provides, in so far as pertinent here, as follows:

"Monthly payments based upon approximate estimates of the amount of and value to the State of expense incurred during the preceding month, as computed by the Engineer, shall be made to the contractor during the progress of the work on or before the 20th day of each calendar month * * * provided also that such monthly estimates need not be paid unless the contractor shall furnish the State Highway Commission an affidavit showing a complete list of all just debts contracted, the amounts paid thereon, and the amount owing by the contractor on such debts, including labor, subcontractors, materials, feed bills, board and grocery bills contracted or incurred in the performance of this contract."

It may be noted that the highway commission had the right, if it was not its duty, to make an allowance for property of value to the state, and it can hardly be doubted that cement and steel on the ground was of such value. There was no requirement here, as counsel for the surety claims, that Turpen should first pay for these items, if on the ground, in order to have an allowance therefor, or that he should file a receipt showing payment. There was given a discretion not to make such allowance unless an affidavit was filed showing all the facts. Whether such affidavit was filed or not is not shown by the record. We take it, by inference, that none was filed, and we think that this was immaterial, when the state highway commission waived it. See Metropolitan Cas. Ins. Co. v. Brick & Tile Co., (Okl.) 29 P. (2d) 771, 776. The only requirement in the contract as to actual payment of accounts is made in that part of the contract which provides for the payment of the final estimate, and the retained percentage. This final estimate and the retained percentage of 15% are not involved in this case. Furthermore, the payments made were at most premature payments. The evidence indicates that the amounts

thereof would in any event have been allowed to Turpen from time to time, and all of it before about the month of March, 1930, some time before the contract was completed. The only reason for filing the receipts was for the purpose of having an allowance made for the items involved before the material included therein actually went into the work. We cannot see how the surety company could have been prejudiced by the earlier payment. In any event no prejudice has been shown, and in the absence thereof we cannot hold that the surety company can complain. Maryland Casualty Company v. School District, 188 Wisc. 520, 205 N. W. 926; American Surety Co. v. Noe, 245 Ky. 42, 53 S. W. (2d) 178; Pickens County v. National Surety Company, (C. C. A.) 13 F. (2d) 758, 762; Monro v. National Surety Co., 47 Wash. 488, 92 Pac. 280; Mazzera v. Ramsey, 72 Cal. App. 601, 238 Pac. 101. In the Pickens County case, supra, the court said:

"We do not see, therefore, how the advancement to the contractor could possibly have caused injury to the defendant, and it was calculated to benefit the defendant, in that it enabled the contractor to proceed with work, the performance of which the defendant had guaranteed. It is well settled that the rule of *strictissimo juris,* ordinarily applied in relief of an individual surety, is not applied in case of compensated sureties, and that where a bonding company, for a monetary consideration, has insured against failure of performance of a contract, it must show that it has suffered some injury by reason of departure from the strict terms of the contract, before it can for that reason be discharged from its liability."

(c) It is argued that the filing of the receipts should operate as an estoppel. But in order to have that effect, some prejudice to the surety company must have resulted. 21 C. J. 1205. But none appears in the record. As far as we can tell, the filing of these receipts had no effect whatever either one way or the other upon the surety company. It is argued that the

surety had a right to rely on them. But it does not appear that it did. We are unable to conjecture, in view of these facts, upon what basis we could hold the existence of an estoppel here, and no basis has been pointed out by counsel.

(d) It is argued that the course pursued by the bank in taking assignments was a fraud upon the surety. In that connection the good faith of Brice, the president of the plaintiff bank, is assailed. He is accused of an unconscionable and diabolical scheme to defraud the surety. We have not been able to discover any evidence in the record in support thereof. It appears throughout that he was but attempting to protect the bank against loss, and that, of course, was his primary duty, if he could do so legally. It is true that he relied upon the fact that the surety would make good any proper claim not otherwise paid, but there was nothing wrong in that. Turpen was a stockholder in plaintiff bank in some small amount, but there is nothing in the record to indicate that this influenced Brice to engage in any improper conduct. Nor did he have anything to do with the bond in question except to countersign it at the special request of the surety company. Counsel argues that it was inconsistent with good faith for the bank to receive assignments and then fail to apply in satisfaction thereof the warrants which included the amounts covered by the assignments. But counsel has overlooked, or has deliberately rejected the explanatory facts appearing in the record. Turpen, like most of us, was not overburdened with riches. He could not build the bridge without financial assistance. In fact, he did not have a dollar with which to carry on the work. The surety company must have known that. If it did not, its agents must have been frightfully negligent in blindly entering into the suretyship on behalf of their principal. The bank agreed to help Turpen, provided that it was secured. There

were, under the circumstances, but three courses which could be followed in order to carry out both of these purposes; the bank could take an assignment of every item that went into the work, and then apply the warrants received upon the amounts so advanced, or second, it could take an assignment of but part of the items, and advance money to Turpen for the purpose of paying the labor and other items, depending for the payment thereof on the warrants that would be issued by the state, or third, it could take an assignment of the amounts due from the State to secure it for advances made. The third course has been the course usually followed by banks in like cases, and the extreme hazard thereof, unless in combination with the first course, is shown by the innumerable cases in which it has been held that a surety is subrogated to the rights of the owner in preference to that of the bank as to any unpaid sums. 60 C. J. 777-781. The plaintiff in this instance chose to follow the second course in preference to the first, for the obvious reason that to have followed the latter would have entailed a great deal of trouble on its behalf. And that trouble is the simple explanation why the bank permitted Turpen to check against the account for whatever he needed, although it may be said in that connection, that Turpen's checks were watched, an attempt was made to prevent him from squandering money, and some of the checks given for the latter's personal needs were turned down, and little, if any, money was in fact squandered. Whatever else may be said as to the course which the bank pursued, the evidence does not show any moral wrong on Brice's part. There was no intentional fraud. The only item in connection with which the bank could possibly be charged with unjust dealing is in connection with the $521.65 note, which was paid out of money paid by the state on the contract in question here. But that isolated transaction

shows no intentional fraud. Defendant has cited us to Detroit Fidelity & Surety Co. v. Equipment Company, (D. C.) 1 Fed. Supp. 845. That case was reversed in Third National Bank v. Surety Company, 65 F. (2d) 548, 550. Counsel has also relied upon Fulghum v. State, 94 Fla. 274, 114 So. 367. In that case there was an intentional and systematic course by which the funds derived from a specific job were applied on old debts which had nothing to do with such job. Nothing of that kind appears in the case at bar. A case much more nearly in point here, and, though in some respects different, presenting in its essentials a similar situation as here, is Third Nat. Bank v. Fidelity & Surety Co., supra. In that case, the bank sued on labor claims assigned to it. The Surety Company had no knowledge of such assignments. While taking them, the bank received money directly from the owner, applying it on loans made to the contractor previously. It was held that plaintiff was entitled to recover on its assignments. Very similar is the case of Southern Surety Co. v. Bank, (C. C. A.) 47 F. (2d) 93. But it is argued that the bank concealed the fact of holding the assignments sued on herein, and that the surety was, accordingly, not treated fairly. The bank, it is true, did not notify the surety thereof. If it had, it possibly could have avoided the present action. It did not do so, perhaps, partially because of the fact that it and Turpen did not expect any loss, but a profit of $15,000. Some unfortunate event no doubt swept away these profits. In any event, while doubtless it would have been better for the bank to have let the surety know, the latter does not seem to have been anxious to find out. But it owed some duty of inquiry. Southern Surety Co. v. Bank, (C. C. A.) 47 F. (2d) 93, 94. In view of the fact that substantially all of the warrants issued by the State were sent directly to the bank for Turpen's credit, it would seem that if the

surety company had made such inquiry, it could easily have discovered the truth. In the case of Third National Bank v. Surety Co., supra, in which the bank took assignments just as in the case at bar without notifying the surety company thereof, the court, among other things, said:

"The surety nevertheless has an interest in the conduct of the job, and has the right to fair treatment and full information. But if information is desired, he must ask it. There is no duty on persons with whom the contractor may deal to give particular notice of the dealing to the surety. The surety is represented by the contractor in the ordinary business of the job. The bank was not bound to notify the surety company of the arrangements it in good faith had made with the contractor to carry on the work."

And in the case of Maryland Casualty Co. v. School District, 188 Wisc. 520, 528, 205 N. W. 926, 929, the court said:

"The surety company complains because it was not notified of the financial embarrassment of the contractor, but there was no duty resting upon the indemnified to notify the surety as a matter of law."

3. So far, then, we have not been able to find any just reason for reversing the case. But counsel argues that the money to be paid under the contract in question was a trust fund so long as it remained in the hands of the state, and that when the plaintiff bank had knowledge of the source of the money which it received, it was its duty to apply it upon the indebtedness which arose out of the contract, namely, the assigned claims sued on herein, and that this was particularly true with the money paid directly to the bank, in that the payment thereof was consistent with and in execution of the trust. If all the money due from the state was a trust fund, as counsel claims, his conclusion should, perhaps, follow. But was it? It is generally held that a surety has an interest in the

reserved percentage withheld by the owner—here the State—and that when such surety pays, under a contract like that at bar, claims for material and labor that went into the work, it is subrogated to the rights of the owner in the amount so withheld, and its rights are superior to the rights of a bank which has loaned money to a contractor and has taken an assignment of the amounts due or to become due under the contract. This is upon the theory that the reserved percentage is just as much for the benefit of the surety as of the owner, and that such bank is a volunteer. Prairie State Nat. Bank v. United States, 164 U. S. 227, 41 L. Ed. 412, 17 S. Ct. 142; Henningsen v. U. F. & G. Co., (C. C. A.) 143 Fed. 810, affirmed in 208 U. S. 404, 52 L. Ed. 547, 28 S. Ct. 389; U. S. F. & G. Co. v. R. I. Covering Co., (R. I.) 167 Atl. 143, 145; United States v. Am. Bond & T. Co., (C. C. A.) 89 Fed. 925; Illinois Surety Co. v. City of Galion, (D. C.) 211 Fed. 161; Southern Surety Co. v. Land & Lumber Co., (C. C. A.) 14 F. (2d) 411; First Nat. Bank v. Pesha, 99 Nebr. 785, 157 N. W. 924; Wasco County v. Equitable Ins. Co., 88 Or. 465, 172 Pac. 126, L. R. A. 1918 D, 732, Ann. Cas. 1918 E, 656; Southern Surety Co. v. Bank, 203 Ind. 173, 176 N. E. 846, 179 N. E. 327; 60 C. J. 777-781; 50 C. J. 259. The universal application of this rule, however, has been challenged. New Amsterdam Casualty Co. v. Wurtz, 145 Minn. 438, 177 N. W. 664; Ganley v. City, 154 Minn. 193, 191 N. W. 738; Standard Oil Co. v. Remer, 167 Minn. 352, 209 N. W. 315. In the first of these cases, a bank had entered into an agreement to finance a contractor, as in the case at bar. The sum of $4735.22 had been paid to the bank out of the reserved percentage on a contract with a school district, and the surety company sought to recover this amount. It was held that the bank was no more a volunteer than the surety company, and that in view of the fact that its loans were

used for labor and material that went into the construction work, the equities were with the bank. In Indiana, and perhaps some other states, the rule has not been found to be just and the surety has, by statute, been made liable for that character of loans made to a contractor. Massachusetts Bonding and Ins. Co. v. Bankers Surety Co., 84 Ind. App. 303, 179 N. E. 329. But in the absence of such statute, the courts have generally, following in the wake of the decisions of the United States Supreme Court, adopted the rule as above mentioned. Some of the courts have refused to go further than this, limiting the right of subrogation to the reserved percentage. Dowling v. Seattle, 22 Wash. 529, 61 Pac. 709; Fidelity & Deposit Co. v. City of Auburn, 150 Wash. 114, 272 Pac. 34; Southern Surety Co. v. Bank and Trust Co., 154 Miss. 412, 122 So. 529; Scarsdale Nat. Bank & Trust Co. v. U. F. & G. Co., 266 N. Y. S. 753, 239 App. Div. 100. Other cases hold that the right of subrogation extends, as against an assignment, dating from the date of the suretyship, to the amount of money unpaid on the contract at the time when the contractor abandons the contract or a dispute concerning the money arises. 60 C. J. 780; First Nat. Bank v. City, (C. C. A.) 114 Fed. 529; Lacy v. Maryland Casualty Co., (C. C. A.) 32 F. (2d) 48; Exchange State Bank v. Federal Surety Co., (C. C. A.) 28 F. (2d) 485; Farmers Bank v. Hayes, (C. C. A.) 58 F. (2d) 34; Maryland Casualty Co. v. Board, (C. C. A.) 66 F. (2d) 730; Fidelity & D. Co. v. Bank, 120 Ark. 519, 179 S. W. 1019; State v. Southern Surety Co., 114 O. S. 323, 151 N. E. 177, 45 A. L. R. 371 and note; 60 C. J. 777-781 and cases cited. And it has been held that payments made in violation of the contract, either by wrongfully paying out the reserved percentage or otherwise, discharges the surety at least *protanto* (9 C. J. 858; Sandusky Grain Co. v. Milk Co., 214 Mich. 306, 183 N. W. 218

and cases cited; Fidelity and Casualty Co. v. Livingston, 234 Mich. 375, 208 N. W. 446; Fidelity & D. Co. v. Bank, supra), or that the money paid may be recovered by the surety, either from the owner or the wrongful payee. U. S. Fid. & G. Co. v. City, (D. C.) 4 F. (2d) 810; U. S. Fid. & G. Co. v. Bank, (D. C.) 4 Fed. Supp. 272; Massachusetts Bonding & Ins. Co. v. Bank, 208 Mo. App. 560, 237 S. W. 182; Aetna Casualty & Surety Co. v. County, 120 Wash. 351, 207 Pac. 237; Cox v. Equitable Ins. Co., (C. C. A.) 247 Fed. 955. Counsel for the surety company contends that the rule of these cases applies in the case at bar. He argues that under them the right of subrogation exists as to all amounts due under the contract when the contractor is in *default;* that Turpen was in default at the very time when assignments were taken by the plaintiff bank; that he should have *paid* the amount, and not have permitted assignments to be taken. It is true that some of the cases, as for instance Lacy v. Maryland Casualty Company, supra, state that the surety is subrogated to the amount of money unpaid on the contract at the time of the default of the contractor. But an examination of the cases will disclose that in most of them the term "default" was used as the equivalent of the term "abandonment." In cases in which this was not true, the money involved was money still in the hands of the owner at the time of the commencement of a dispute, or, as in Chouteau Trust Company v. Bonding & Ins. Co., (C. C. A.) 1 Fed. (2d) 136, had not yet been applied on any indebtedness of the contractor and had not yet been paid out by him. There is one case, however, and only one so far as we have found, which leans in the direction of counsel's contention. That is Fidelity & Casualty Co. v. Livingston, 234 Mich. 375, 208 N. W. 446, 448. In that case it appears, if we understand the facts correctly, that the city had the right to retain all the

money owing the contractor, if claims for labor and material were filed. None were actually filed, but a number of them were actually unpaid, and the surety was required to pay them. In the meantime the city paid the bank, as assignee of payments due from the city, the sum of $4,667.44 on a monthly estimate. This was done before the contractor abandoned the contract. It was held that the surety company had a right to recover from the bank the amount which it applied on a loan to the contractor. The decision is by a divided court. The majority based their holding on Board v. Surety Co., 216 Mich. 528, 185 N. W. 755. That case does not, however, furnish a sufficient basis for the holding in the Livingston case, for it merely involved a reserved percentage. The Livingston case is opposed, in principle, to all the cases, hereafter to be cited, which hold that a surety company has no right to any money which is not part of the reserved percentage, and has been paid to a contractor and applied on his indebtedness. It is specifically opposed to part of the holding in Metropolitan Casualty Co. v. Brick & Tile Co., (Okl.) 29 P. (2d) 771, in which it was held that the mere right of the owner to retain money due on the contract, outside of the reserved percentage, gives the surety company no lien thereon. It is also in conflict with Maryland Casualty Co. v. Board, (C. C. A.) 66 F. (2d) 730, 738. In that case the defendant bank had received nine payments out of monthly estimates. On July 2, 1927, it received a warrant from the owner, a municipal corporation, for $7067.83, also paid on a monthly estimate. Part of this was paid out by the contractor on the work, the remainder was credited on the contractor's notes. The surety which had an unrecorded assignment from the contractor sought to recover the amount of this warrant on the theory that at the time the latter was issued the bank was then

charged with notice of the contractor's impending failure. The court said:

"Even if this were proved * * * the bank's assignment would protect it in accepting payment. It was twenty days before a default was declared by the board. The bank had no notice of the prior unrecorded assignment to the surety, and therefore we see no basis for asserting that the surety had a prior equity in payments due to Lloyd (the contractor) under the terms of the contract. The district court was correct in allowing the bank to retain this payment."

The Livingston case is also squarely opposed, as we see it, to prior and later Michigan cases, namely, People v. Powers, 108 Mich. 339, 66 N. W. 215, followed by Vosburgh v. Middleditch, 214 Mich. 489, 183 N. W. 208, and Kuhlman Electric Co. v. American Surety Co., 259 Mich. 547, 244 N. W. 158, although the Michigan court apparently deems the cases reconcilable. In the last mentioned cases it was held that a materialman with knowledge of the source of the money, may, in the absence of directions to the contrary, apply payments made to him on an old account instead of an account for which the surety is responsible. It is most difficult to see why a payment out of monthly estimates should be in a worse position when made pursuant to an assignment than when made without one, or why an old account of a materialman, not in any way connected with a construction work in question, should be in a better position than an account or a note of a bank similarly situated. The difference of treatment seems to be rank discrimination. But if there is, perchance, in principle, a distinction, then the case at bar falls within the rule of the last mentioned cases, instead of within the rule of the Livingston case, since the plaintiff bank was not an assignee of monthly estimates as the bank in that case, but an assignee of materialmen, and stands, accordingly, in their shoes. If counsel's contention is correct, it would necessarily

follow that no assignments of claims for material or labor can be taken at all, so as to protect the assignee. This would be directly contrary to a number of cases in which suit was brought and sustained upon such assignments. Third Nat. Bank v. Fidelity & Surety Co., (C. C. A.) 65 F. (2d) 548, and cases cited; Southern Surety Co. v. People's State Bank, (C. C. A.) 47 F. (2d) 93; Maryland Casualty Co. v. Philbrick & Nicholson, supra, and cases cited. Moreover, if we examine the contract in question in the case at bar, we find that it failed to provide that payment of claims should be made as they become due. It required such payments to be made only before the final estimate and the retained percentage were paid. In fact there was no provision that the State might take over the work. Hence there was no violation of the contract itself and no default thereunder. The bond given by Turpen and the surety company, it is true, provided that it should be void if the contractor paid all claims as they became due, otherwise to be and remain in force and effect. But that provision, we take it, was inserted therein, not for the purpose of putting the contractor in default under the contract, but for the specific purpose of avoiding it. It did not, in terms at least, give the State the right to retain any money due the contractor on the monthly estimates or to declare the contractor in default as long as he went ahead with the work. We should hesitate to hold that this right was given by implication. That is particularly true in view of the specific provision above mentioned as to when, and what portion of, money should be retained till all claims for labor and material were paid. That provision gives rise to the application herein of the rule of *expressio unius est exclusio alterius*. The contract in the case at bar, insofar as the money herein involved is concerned, is in the same situation as contracts under the Vrooman Improvement Act in California,

which contained no provision that payments to the contractor should be withheld until the claims of materialmen and laborers had been paid. It has been held under the act that an assignment of the payments by a city is superior to the rights of the surety company. Adamson v. Paonessa, 180 Cal. 157, 179 Pac. 880; Los Angeles Rock & Gravel Co. v. Coast Const. Co., 185 Cal. 586, 197 Pac. 941; U. S. Fidelity & Guaranty Co. v. City, 55 Cal. App. 209, 203 Pac. 151. See also Cass v. Smith, 146 Tenn. 218, 232-233, 240 S. W. 778. As already stated, no reserved percentage is involved in this case. The only money in question is that which was paid out on monthly estimates. Hence the cases heretofore cited, giving a lien, or creating a trust, have, aside from the Livingston case, no application herein and cannot be relied on as authority, although at times containing general language favorable to counsel's contention.

The only cases, accordingly, in point herein, are those which deal with money already paid out on a contract pursuant to monthly estimates, payable as the work progresses, and the question is whether there is a lien or trust also as to such money, which can be pursued in the hands of a third party to whom the money has been paid. We might say in that connection that counsel seeks to draw a distinction between the money which was paid directly to the contractor and then turned over to plaintiff bank, and the money which was paid directly to the latter. Two warrants were issued directly to it. This was done after the contractor had signed and filed an affidavit for the claim therefor, and had directed in writing that the warrants should be issued directly to the bank. These warrants were not treated differently from other warrants made out to Turpen, but sent directly to the bank and endorsed by Brice as agent for Turpen. All were deposited to Turpen's credit. This course was

apparently pursued so that the money might reach the bank more quickly, saving the contractor some interest. It would seem to be clear that there can be no material difference whether Turpen signed the warrants after they were issued to him, or whether he directed them to be issued directly to the bank. A difference of a few hours or days in obtaining his signature cannot, in reason, make any difference in the application of the legal principle involved herein. State v. Miller, 169 La. 914, 126 So. 422, 423; Southern Surety Company v. Bank, 47 F. (2d) 93; Third Nat. Bank v. Fidelity & Surety Co., (C. C. A.) 65 F. (2d) 548.

It has been distinctly stated, in some cases, that the money paid out in monthly estimates does not constitute a trust fund, yet not disputing that such money might be applied inequitably as to the surety. Third National Bank v. Fidelity & Surety Company, (C. C. A.) 65 F. (2d) 548; B. F. Sturtevant Co. v. Fidelity & Deposit Company, 92 Wash. 52, 158 Pac. 740, 745, L. R. A. 1917C, 630. It is unfortunate that these cases do not point out why such distinction should be drawn, inasmuch as, at first glance in any event, it seems difficult to perceive how a surety can object to the application of a payment, unless it has a lien, or other right. Be that, however, as it may, there are cases which hold that a surety has what is termed an equitable lien on all money arising out of a contract for which it is surety, even though the person to whom the money is paid has no knowledge of the source thereof, and that, if such payee has two accounts, one connected with the contract in question, and one not, the surety has the right to have it applied on the former. Columbia Digger Co. v. Rector, (D. C.) 215 Fed. 618; Columbia Digger Co. v. Sparks, (C. C. A.) 227 Fed. 780; United States v. Am. Bonding & Trust Co., (C. C. A.) 89 Fed. 925; Alexander Lumber Co. v. Aetna Accident & Lia-

bility Co., 296 Ill. 500, 129 N. E. 871. See also U. S. Fidelity & Guar. Co. v. Allied Products Co., 45 Ohio App. 270, 187 N. E. 83. Other cases hold that the surety has the right to have such payments applied on the indebtedness for which it is liable, if the payee knows the source of the payment. Crane v. Pacific Heat & Power Co., 36 Wash. 95, 78 Pac. 460; United States v. Johnson etc., (C. C. A.) 67 Fed. (2d) 121; Maryland Casualty Co. v. Dupree, 223 Ala. 420, 136 So. 811; Note, 21 A. L. R. 714; 49 A. L. R. 955; 21 R. C. L. 111. Still other cases hold that when the payee has no knowledge of the source, the surety has no control over the application of the money. U. S. Fid. & G. Co. v. Butcher, 223 Ala. 606, 137 So. 446; B. F. Sturtevant Co. v. Fidelity & Deposit Co., 92 Wash. 52, 158 Pac. 740, L. R. A. 1917C, 630; note 21 A. L. R. 718; 49 A. L. R. 955; 60 A. L. R. 205. Some of the cases, like Salt Lake City v. O'Connor, 68 Utah 233, 249 Pac. 810, 811, and City of Marshfield v. U. S. Fid. & G. Co., 128 Ore. 547, 274 Pac. 503, contain language which indicates that the surety company ought not to have the right of application. But in these cases the payee did not know the source of the money, and we cannot say what these courts would, upon further consideration, hold in a case where, as in that at bar, the payee had knowledge of the source from which the money was derived. It is possible that the Oregon court might feel itself bound by the case of Bross v. McNicholas, 66 Or. 42, 133 Pac. 782, Ann. Cas. 1915B, 1272, where it was said, though by way of *dicta*, that a payee with knowledge of the source is bound to apply a payment on the debt for which the surety is liable.

In all these cases courts have groped about and endeavored to discover and declare the principle of justice and equity which should govern, but have not been able to come to an agreement. If a party has a special interest in a fund out of which payment is to be made,

for instance an owner who in fact owns the fund, there is much to be said in favor of holding that in such case the payment made should be applied on the indebtedness which otherwise might be enforced by a mechanic's lien. But the cases even on that point are in conflict. Note 41 A. L. R. 1298. The same may be said when such special interest arises by reason of an assignment to the surety, known to others, of the funds out of which payments are to be made, as was true in Southern Surety Co. v. Bank, 203 Ind. 173, 176 N. E. 846, 179 N. E. 327. So when a construction contract provides that a certain percentage shall be reserved, there is a contractual basis for the equity in favor of the owner and the surety, and the same is true, to some extent at least, when the owner has the right to take over the work upon default or abandonment on the part of the contractor, and a sum beyond a certain percentage has been retained under a right to do so. And if a contractor has agreed to apply payments made to him on claims enforceable against a surety, the duty to do so should, of course, if possible, and just, be enforced. But how does such special interest or equity arise in the absence of any of these factors, as in the case at bar? As stated in Grover v. Board, 102 N. J. Eq. 415, 141 A. 81, some of the courts have assumed it without proving it. To hold funds, such as are involved in the case at bar, to be trust funds, to be applied only on the undertaking of the surety, is equivalent, under the circumstances in this case, to saying, if carried out logically, that the surety has merely undertaken to pay a deficiency remaining after the fund has been exhausted and applied on its indebtedness, when, in fact, there is no limitation of that kind in the contract. The general rules of subrogation furnish us little light. It is said that "a subrogee is, generally speaking, placed in the precise position of the one to whose rights he is subrogated, and is

entitled to all the rights and securities and the benefit of all the remedies which were available to such person." 25 R. C. L. 1377. The surety in this case could only be subrogated either to the rights and remedies of the state, or of the principal, or of the materialmen or laborers. 60 C. J. 777. The latter had no rights. They could merely sue the surety. To say, as was done in Columbia Digger Co. v. Rector, (D. C.) 215 Fed. 618, 630, that they had an equitable right is simply not true. There can be no equitable right when there is no right at all. The State's right, inuring to the surety's benefit, consisted of the right of retention of the final estimate and the reserved percentage, not in question here. It is difficult to see how Turpen had any rights left after he paid out or permitted to be paid out the money which he had collected and which he had a right to collect. Hence it would seem clear that if there was any right upon which subrogation could be based, it consisted merely of the general right, based upon broad principles of justice, that the money should be paid out only upon claims for which the surety was responsible, and upon no other. It may be admitted that the argument that such general right exists is not without force. And counsel for the surety company has vehemently, and in fact eloquently argued that this view is the only just and equitable view that can be taken in the case at bar, and he finds it impossible to see any equity in the contrary view. But calm reflection will show that the equities are not so one sided as counsel thinks. If the foundation of counsel's view rests merely upon broad principles of equity—and no others have been found— there is force, too, in the argument that the surety should carry out its contractual duty in the spirit in which it was supposedly undertaken. If it leaves a contractor, who is not financially able to carry out his contract, stranded, compelling him to borrow money

from a bank, and such money is expended on the work, to that extent liquidating debts which the surety would otherwise have been compelled to pay, an argument that all equities must, notwithstanding these facts, necessarily be with the surety company, sounds somewhat out of tune. The principles of natural justice and equity must necessarily be interpreted in the light of, and depend upon, the actual and existing human factors which confront us. The argument that the surety pays under compulsion, and that a banker is a mere volunteer, should not be carried too far, for the broad principle of equity to which the surety appeals might be thwarted rather than applied. In fact, if counsel's broad argument is correct, and we should hold as contended, namely, that the fund in question is a trust fund which must be preserved in favor of the surety at all hazards, we might as well be frank and hold that when banks undertake to assist contractors, they, in the main, merely become aids for the relief of sureties. That would ultimately, of course, either compel sureties to engage in financing contractors, or construction contracts would be let only to persons or associations with ample financial means to carry on their work independent of any financial help. It may be that, economically, this would be a desirable result. But courts do not exist for the purpose of shaping economic forces, and we must deal with situations as we find them. At the present time, as pointed out in Standard Oil Co. v. Day, 161 Minn. 281, 201 N. W. 410, 412, 41 A. L. R. 1291, most contractors must necessarily use some of the money which they receive under contracts in payment of their general obligations. And few are able to carry out a contract of any size without financial support. In the case at bar the contractor apparently had no means with which to carry out his contract. But for the bank, the surety would have been compelled to come to his rescue at the very begin-

ning of the contract, or to have then taken over the work thereof. All but a comparatively small amount of the money loaned by the plaintiff bank went to pay amounts for the payment of which the surety was under obligation. These facts were or should have been known to the surety. To say that under such circumstances all the broad principles of equity are, as claimed, in favor of the surety company, which, so far as the record shows, paid no attention to whether or not the contractor was able to, or would carry out his contract, is, we think, going somewhat too far.

For the reasons pointed out, and others, a number of the courts have seen no justification in holding that a surety has an equitable lien on funds like those involved herein, at least after it has been paid out, and have believed it to be for the public interest, in the absence of a contract to the contrary, to permit such funds to be freely applied in the commercial world as the contractor may see fit. They hold that such funds are the property of the contractor, and they hence apply the rule stated in 48 C. J. 663 that "the exercise of the right of appropriation of payments belongs exclusively to the debtor and creditor and that no third person can control or be heard for the purpose of compelling a different appropriation from that agreed upon by them," or made by the creditor in the absence of direction on the part of the debtor, in accordance with the general rule. 48 C. J. 642. Counsel for the surety seems to argue at times that these cases have no application here. We do not understand upon what theory that can be said. We think they are directly in point. The monthly estimates were, notwithstanding the contention to the contrary, paid unconditionally, and went into "trade" when they were turned over to the bank just as effectually as if turned over to anyone else. The bank, in so far as it was assignee of claims, stood in the same position as a materialman. And the

ultimate question is whether it was compelled to apply the money which it received in such claims. If not, then it could, of course, apply it on loans owing it by the contractor, or permit the latter to check it out. The latest case on the subject is Metropolitan Casualty Ins. Co. v. United Brick & Tile Co., (Okl.) 29 P. (2d) 771, 776, decided on January 16th of this year. In that case there was a contract requiring the contractor to use the money on the work under his contract, but the payee of some of the funds, a material man, had no knowledge thereof. It did, however, have knowledge of the source of the money paid to it and applied by it on an account not connected with the work in question. After an exhaustive review of the authorities, it was held that the surety company had no special equity in the fund, and that the payee had a right to apply the money paid to it on an old account. The court said in part:

"We are constrained to hold that the contract price is subjected to no equity in favor of the surety as against materialmen furnishing material for the construction of said project unless such equity arises in a proper manner by contract between the surety and said contractor, of which contract the materialmen are required by other provisions of law to take notice. The purpose of requiring the execution of said bond was to relieve materialmen of anxiety concerning payment of the indebtedness for furnishing material used in the construction of public works. The bond is an unconditional guaranty of payment and the compensated surety places itself in the position of peril voluntarily and assumes the risk incident to the default of the contractor in paying his obligations. To hold otherwise would strike down the manifest purpose of said bond and would enable contractors engaged in public works to thwart the just claims of materialmen who are creditors."

The Minnesota court, which, as stated, has held that a bank loaning money to a contractor has at times a superior right even to a reserved percentage also has

indeed held that the equitable lien of the surety extends to all the money agreed to be paid on a contract, the lien dating from the date of the suretyship. Barrett Bros. Company v. County of St. Louis, 165 Minn. 158, 206 N. W. 49. Queerly enough, perhaps, it further holds that such lien vanishes when the money is paid out, though it is paid to another who has knowledge of the source. Standard Oil Co. v. Day, supra. In that case it was held that a creditor, a materialman, having such knowledge, was fully authorized to apply the money paid him on an old account, rather than on an account for which the surety was liable. The court, ably discussing the point, said in part as follows:

"The position of appellant assumes that a surety has a right that the earnings of the contractor under his contract shall be applied upon the labor and material going into the structure when no such agreement is stated in the bond or provided by statute. Our public contractor's bond contemplates that the contractor will receive and disburse his money as suits his convenience. The original contractor in this instance could have protected itself by requiring a bond from the subcontractor. It may have done so. Where the bond is furnished the surety must recognize the possible occurrence of what here did occur as one of the perils of its business. In other words one who becomes surety takes the risk that honest payment of unsecured debts may leave a deficiency which the surety must make good. * * * * The authorities that hold contrary to our view do so upon the theory that such moneys are impressed with an equity in favor of the surety that entitles it to have the money applied in payment of liabilities incurred by the contractor under the contract. If such an equity exists as against a creditor, who has a current account arising out of the contract and also an account incident to some other and prior transaction, that prevents the creditor and his debtor agreeing that moneys which the creditor has received from payments under a particular contract shall be applied upon such prior indebtedness, it would seem that upon the same logic and reason, if this same cred-

itor's claim consisted exclusively of the old account, he could not safely accept such moneys, with knowledge of their source, upon the old account. The money should still be subject to such equity in favor of the surety, and, if the rule is followed to its logical conclusion, the surety in case of loss could recover payment from the general creditor. This leads to an instability in commercial business that does not have our approval. * * * * Most contractors and subcontractors must necessarily use some of their money that they receive in payment of obligations, not incurred in the particular contract from which their money is received. When they receive their money unconditionally it is their own and they may do with it as they please. * * * * The business of sureties is inherently one of constant peril, and their imperative watchfulness for their general protection makes it less burdensome for them to guard against the emergency here under consideration, and our view tends more to the stability of ordinary business."

The rule of this case was again applied in the later case of Radichel v. Surety Co., 170 Minn. 92, 212 N. W. 171, and was cited with approval and applied in S. W. Towle Lumber Co. v. Anderson, 208 Cal. 371, 281 Pac. 500.

Similar is the case of Jefferson v. Church, 41 Minn. 392, 43 N. W. 74, 75. The materialman to whom money arising out of a contract was paid knew the source thereof. The case is approved by Williston on Contracts, 3, 3123. The court succinctly said:

"The debt was paid to the contractors on their contract with the church. * * * When this money was so received by them, it was their money, and they were at liberty to use it as their own, and apply it in payment of such debts as they chose; and so also, in the absence of an express stipulation or arrangement between the parties interested in respect to its application, communicated to the plaintiffs (the materialmen) at the time the latter were at liberty to apply it as they did."

The case of Grover v. Board, 102 N. J. Eq. 415, 141

A. 81, affirmed in 104 N. J. Eq. 197, 144 Atl. 918, too, is a well reasoned case, and holds the same as the Minnesota case just cited, and under a similar state of facts, the materialman involved having knowledge of the source of the money paid him. It calls attention to the fact that a surety is but a contingent creditor, and that as such it has not, and should not have, any greater rights than any other creditor; that it has the power in its hands to make a contract with the contractor providing that the payments made under the contract shall be applied in a particular manner, and that in the absence of such contract the court has no right to create a "hybrid" right in favor of the surety; that there is no sound argument for such special equity, and that to give it would be productive of a great amount of litigation and would impose an almost intolerable handicap on business. In the case of Chicago Lumber Company v. Douglas, 89 Kans. 308, 131 Pac. 563, 567, 44 L. R. A. N. S. 843, there was a contract with the state to erect a memorial. Payment was made on the contract and turned over to the Lumber Company, which applied it on an old account, instead of an account of material connected with the contract for the memorial. No reserve fund was involved. There was conflicting evidence as to whether the Lumber Company knew of the source of the money but the court ignored that point. After holding that the bond given in the case operated as a substitute for the rights and equities which might be acquired under the lien laws, it proceeds to state:

"After the bond was given the only relation there was between the contractors and the lumber company was the ordinary one of debtor and creditor, and, as far as the surety company is concerned, the money paid to the contractors by the state was their own, and they could do with it as they pleased. The surety company could claim nothing by way of subrogation to the rights of the state as the state had paid in full for the

work, and there was no fund or security in its hands, which any claimant could reach. * * * For a valuable consideration the surety company gave this bond guaranteeing that the labor and material furnished should be paid for. The giving of such a bond relieves the laborer and materialman from looking after liens or other security. The owner is then at liberty to pay his contractor when he pleases without liability to any subcontractor, and the contractor is free to draw his money from the owner and pay it out as he may choose. The duty of the lumber company and the liability of the surety company are measured by the terms of the bond. There is nothing in it, as we have seen, which requires that money received by the contractor for the structure shall be applied on the claims of those furnishing labor and material, but there is an absolute and unqualified guarantee that all indebtedness for labor and material shall be paid."

The case of George H. Sampson Co., plaintiff, v. Commonwealth, 208 Mass. 372, 94 N. E. 473, 474, involved a contract with the state for the construction of a public work. The plaintiff, a materialman, received certain payments from the contractor, and applied part of it on an old account, and the surety contended that it should all be applied on an account arising in connection with the public work in question. The case is silent as to whether the plaintiff had knowledge of the source from which it came. The court evidently did not consider that point material, and the decision is based upon an altogether different ground. There was no limitation on the state as to when and how the money was to be paid out. It was held that the surety was liable for the balance of plaintiff's account, stating:

"There having been no agreement or understanding between the parties as to the application of the money, the plaintiff could apply it as it saw fit, and the fact that the surety company was liable on a portion of the plaintiff's entire demand against the contractors did not give it the right to have the whole amount received by the plaintiff applied to that portion. * * * * The surety company could have protected itself by a provi-

sion in the stipulation signed by it and the other parties interested in regard to payment by the commonwealth, but not having done so it cannot now object to the application which has been made by the plaintiff. The result is that the surety company is liable for the balance that remains due on the plaintiff's demand."

In the case of Kane v. Bank, (C. C. A.) 56 F. (2d) 534, 535, 85 A. L. R. 362, the bank received a check for $10,000 from the contractor with knowledge of its source, and applied it on a debt which the contractor owed the bank. The surety sought to recover it. Only one debt was involved in this case, a loan by the bank, and the court distinguishes the cases of Columbia Digger Co. v. Sparks, (C. C. A.) 227 Fed. 780, on that account, without, however, endorsing the holding in that case. The court held that the money received by the bank was not trust money and said in part:

"We are not advised of any statute which requires that payments duly made to a contractor for public work be handled by him in any special way, or be given any particular application. No such contractual obligation appears in this case. In the absence of statute or stipulation otherwise the general responsibility of the contractor is credited in contracting with him, and his general resources are drawn on by him in executing the contract. Money or checks paid to him as the work progresses are the property of the contractor unincumbered by any trust, much as are payments to others for goods manufactured or services performed. The contractor's banker may receive such checks and is not bound to see to their application, nor to ascertain the state of the contractor's account with each contract; nor, if he knows it, need he govern himself in any wise with reference thereto. No wrong is done to the contractor's surety in recognizing the contractor's full title to such checks by taking them on deposit with all the consequences ordinarily attaching to such deposit."

The case of State v. Miller, 169 La. 914, 126 So. 422, 428, is very closely in point in the case at bar. Counsel for the surety company do not so consider it, because it is based on the civil law. But we have taken much

of our equity law from the civil law (21 C. J. 24), and the doctrine of subrogation owes its origin thereto. Story, Eq. Jur. (14th ed.) Vol. 2, Sec. 706; 54 Central L. J. 421. Hence since there is a conflict on the point under consideration in the cases decided under common-law jurisdictions, we may very appropriately turn to Louisiana to shed light on the subject before us. The case is very instructive. The bank involved in that case loaned money to the contractor, from whom it received money from time to time. Becoming dissatisfied, an arrangement was thereafter made whereby the bank took assignments from laborers engaged in the work of the contractor, and thereafter received monthly payments made on the work directly from the owner, the highway department of the state. It applied part of these payments, just as in the case at bar, on the old debt, rather than on the assignments, and permitted the contractor, just as in the case at bar, to check out the balance. The contention was made in that case, as in the case at bar, that the payments should have been made on the assignments. The court denying the correctness of the contention said in part:

"The argument of the surety company is, substantially, that the company had an equitable lien on all sums due by the highway department to Miller under the contract which the surety company had bonded, and that the bank was therefore obliged to apply all such funds received by the bank for Miller's account in the payment of debts which the surety company was responsible for, rather than to debts which Miller alone owed the bank. In support of the argument, the attorneys for the surety company cite several decisions rendered on the equity side of the federal courts, in contests between ordinary creditors of a contractor, on the one hand, and the surety on his bond, on the other hand, each claiming a preference in the distribution of a fund due the contractor under his contract. Those decisions are not authority in this state. There is no such thing as an equitable lien in Louisiana—no lien at all unless it is created by statute. Besides, the bank

is claiming not as an ordinary creditor of the contractor, but as subrogee of those whose claims the surety company guaranteed the payment of, and whom the surety company could not compete with in the distribution of funds due to the contractor in virtue of the contract. * * * There was no fraud in this case on the part of the bank, and none is charged by the surety company. The bank was not under any contractual obligation to the surety company, did not occupy any fiduciary relation with the surety company, and was not obliged, either morally or otherwise, to apply the payments received from the highway department for Miller's account to the advantage of the surety company and the correlative disadvantage of the bank."

The case of Southern Surety Company v. Bank, (C. C. A.) 47 F. (2d) 93, 94, too, is almost exactly in point herein. The surety had signed a bond similar to that involved here. The bank in that case loaned money to the contractor to carry on his work for the highway department of South Carolina. Being unwilling to advance any more money, an arrangement was made wherby the bank thereafter advanced money for assignments of labor and material claims, at the same time taking the notes of the contractor, and an assignment of future estimates. The bank collected on such estimates on the project enough to pay practically all the old indebtedness of the contractor, on which the payments were applied, but not enough to pay the assigned claims, and suit was brought on the latter, just as in the case at bar. The court upheld the contention of the bank. While an equitable lien in favor of the surety company was not discussed, the denial of such lien is clearly implied in the decision. The court said in part:

"A study of the record and the charge of the learned trial judge leads us to the conclusion that the action of the court below was proper. Bonds of the character of the one here involved are to be liberally construed. * * * A compensated surety can only be relieved where the circumstances clearly justify relief. * * * Here we can

find nothing in the evidence that proves that the bank did anything improper or anything other than what it should have done in a proper effort to protect its interests. The surety company evidently knew, or, by proper inquiry upon which it was put, could have known, the exact situation. The money with which the bank paid the material and labor claims, and for which it took a proper assignment, went for the carrying out of the project. The assignee of a labor or material claim takes all the rights of the assignor against the contract bond. Title Guaranty & Trust Co. v. Crane, 219 U. S. 24, 31 S. Ct. 140, 55 L. Ed. 72. It is equally true that the mere fact that the holder of such a claim takes the note of the contractor for the amount of his debt does not affect his rights against the surety on the bond."

The case does not distinctly state that the money paid to the bank was paid to it directly by the highway department, but in view of the fact that it had an assignment of all future estimates, we take it that that was true. Hence this case, and the Louisiana case, and Third Nat. Bank v. Fidelity & Surety Co., supra, effectually dispose of the contention heretofore mentioned, that a distinction should be drawn between payments made directly to the bank, and payments made to the contractor and then turned over to the bank. See further on this subject, and as supporting the view of the foregoing cases, People v. Powers, 108 Mich. 339, 66 N. W. 215; Vosburgh v. Middleditch, 214 Mich. 489, 183 N. W. 208; Kuhlman Electric Co. v. American Surety Co., 259 Mich. 547, 244 N. W. 158; School Board v. Bank, (Va.) 170 S. E. 625; Third National Bank v. Fidelity & Surety Co., supra; Bankers Surety Co. v. Maxwell, (C. C. A.) 222 Fed. 797; Scarsdale Nat. B. & T. Co. v. U. S. Fid. & G. Co., 239 App. Div. 100, 266 N. Y. S. 753; Meyer v. Cooper, 156 Tenn. 637, 7 S. W. (2d) 38; Williston on Contracts, 3, 3122-3123. Inferentially a lien which arises out of general principles of equity in favor of a surety on money already

paid by the owner was also denied in the case of Maryland Casualty Co. v. Board, supra. And almost the same may be said of Chouteau Trust Co. v. Bonding & Ins. Co., supra, in which such lien was recognized only because of an assignment to the surety of which the bank had notice.

And this general view has been approved and adopted by the American Law Institute in its Restatement of the Law of Contracts. In Sec. 387 of that work is stated the general rule of the application of payments when a creditor has two or more debts which are owing him, and which is similar to what is stated in 48 C. J. 642. In illustration of the rule is given the following:

"A contracts with B to erect a building and gives B a bond with sureties to secure the payment of claims for labor and materials. In the jurisdiction where the contract is made laborers and materialmen can enforce such a bond to satisfy their claims. B makes payments to A on account of the building as the work progresses. A, with money so obtained, pays C to whom he is indebted not only for materials furnished for the construction of B's building, but also for other materials. A gives no direction for the application of the payment. C can apply it to other claims than that for materials furnished for B's building, although he is aware of the source from which the money is derived."

In Section 388 of that work it is stated that if the payor is under a duty to a third person to devote money paid by him in a particular way, it must be so applied if the creditor knows or has reason to know this duty, and in illustration thereof is given the following:

"A enters into a contract with B to construct a building, to be completed free of liens. Under the contract payments are due from B from time to time. C furnishes labor and materials toward the construction of the building under a subcontract with A. C has a mechanic's lien on the building for the labor and materials. B makes payments to A as they become due

under his contract. A is indebted to C not only under the subcontract with reference to B's building, but also on other accounts. A pays C money received from B. C knows that it has been so received. A, on making the payment, directs its application to a matured claim on one of the other accounts. The direction is effective, since A is under no duty to B to use the payments made by B in a particular way."

We should, perhaps, before closing refer to Southern Surety Company v. Bank, 203 Ind. 173, 176 N. E. 846, 179 N. E. 327, upon which great reliance is placed by counsel for the surety company. It has in common with the case at bar the fact that the contractor was permitted to freely check against the fund derived from the payments made under the contract in question. Counsel insists that a great wrong was committed against the surety thereby. But this, as the evidence, on the whole, indicates, was done pursuant to the agreement made between the bank and Turpen, to the end that the latter could perform his contract. Unless it was wrong for Turpen to check out the money, it could not be wrong for the bank to permit him to do so. And if Turpen was the owner of the fund, as held by some of the cases cited, free from any lien of the surety company, it is difficult to see how he committed any wrong, at least in the absence of an intent to defraud, of which there is no evidence. In the Indiana case a bank loaned the contractor various sums of money. Under the law of that state, payment of these loans, in so far as they went into the work, was guaranteed by the surety company. The bank received large amounts on the contract, but applied only a small portion on the loans, and paid most of the money back to the contractor. It was held, in effect, that the bank could not recover from the surety company; that there was an agreement that the bank should collect and apply the payments on the loan; that when payments were, accordingly, made in sufficient amount, the loans

were paid, and could not be revived against the surety company which had a contractual lien. We have no such facts here, and the case cannot be said to be in point. The case of U. S. Fidelity & Guar. Co. v. Allied Products Co., 45 Oh. App. 270, 187 N. E. 83, is a similar case. In fact, both of these cases present an almost systematic diversion of the funds, which is not true in the case at bar.

We find, accordingly, two irreconcilable views, under one of which the bank should have satisfied the assignments sued on herein from the money which it received. Under the other there was no such duty on the bank, since there was none on Turpen to apply the funds received in any particular manner. The latter view is that approved by the Law Institute. Under it, the bank had the right to apply part of the funds received on only one of the debts which it held—the loans to Turpen, which were not secured, and neither Turpen nor the bank owed the duty to the surety company to prevent the withdrawal by the former of the remainder of the funds. We have not heretofore had the occasion to pass upon the points involved in this case, and the question is therefore fairly before us whether to approve or repudiate the view of the Law Institute thereon. We have examined about all of the numerous cases that have, directly or indirectly, any bearing herein. We think, after carefully weighing the arguments on all sides, that we should follow the Institute's view, if for no other reason than that of uniformity, which is of importance to sureties as well as to others. The judgment of the trial court must, accordingly, be affirmed, and it is so ordered. We may add, that this view is in harmony with that taken by the Federal District Court of this district on a similar question arising in a suit in which the surety company herein sought to recover from the plaintiff bank herein the amount of the warrant of $22,818.33 mentioned in the statement of facts,

issued for the steel truss under the second contract heretofore mentioned.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.