NATIONAL SURETY CORPORATION, a corporation, Plaintiff-Appellant,

v.

H. R. (Abe) FISHER, Defendant-Appellant, The Century Indemnity Company, a corporation, Intervenor-Respondent.

No. 45641.

Supreme Court of Missouri, En Banc.

Nov. 10, 1958.

James H. Keet, Springfield, for plaintiff-appellant.

Allen, Woolsey & Fisher, Harold J. Fisher, Springfield, for appellant, H. R. (Abe) Fisher.

J. Weston Miller, John H. Fairman, Mayte Boylan Hardie (Miller, Fairman & Sanford, Springfield, on the brief), for respondent-intervenor.

EAGER, Judge.

Plaintiff, National Surety Corporation, instituted this suit by attachment on May, 26, 1954, against the defendant Fisher, and by summons in garnishment levied on a deposit standing in Fisher's name in the State Bank of Lebanon. The answer of the garnishee admitted a deposit of $8,593.62, and it subsequently paid that money to the clerk of the court. The respondent Century Indemnity Company intervened, claiming a prior right to the fund. Following a jury-waived trial, the court sustained the attachment, but, on the merits, awarded the money to the intervenor. A considerable portion of the facts are stipulated and certain others are documentary.

It will be impossible to state all the facts or review all the cases cited within the scope of this opinion. Plaintiff had, on August 7, 1953, executed a performance bond for Fisher for the construction of a school building at Dixon, Missouri. We shall refer to this as the Dixon job. Fisher completed that job, presumably prior to May 1, 1954, but failed to pay various bills thereon totaling $12,759.90. Plaintiff paid these bills, two on the day this suit was filed, and the rest later; at the time of filing it had actually paid none. In its petition it alleged: the making of the construction contract, the execution and substance of the performance bond and the application therefor, and that, upon information and belief and in so far as plaintiff could determine, Fisher owed $13,868.01 in unpaid claims for which plaintiff was responsible; that, however, plaintiff did not waive the right to contest the amounts of any such claims. Plaintiff prayed a money judgment against Fisher in the amount of $13,868.01, plus $2,500 for its expenses.

Plaintiff's attachment affidavit alleged: (1) nonresidence; (2) that defendant was about to convey fraudulently property and effects to hinder and delay creditors; and, (3) that defendant had fraudulently concealed, removed and disposed of his property and effects. By a verified motion to dissolve the attachment, defendant alleged that he was a resident of Missouri, that plaintiff's petition was, in effect, a suit in equity in which an attachment would not lie, and that it stated no cause of action. This motion was overruled, but it seems to have been agreed between the parties and the court that this should not prejudice the presentation of some or all of these matters at the trial. The agreement is somewhat vague, but we may consider the issues as remaining open. On June 4, 1954, defendant filed an answer in which he attacked the court's jurisdiction and renewed, on special appearance, his request that the attachment be quashed, denied that he was a nonresident, and took issue on the merits of plaintiff's substantive allegations; defendant also alleged that the money attached was a trust fund created for the specific purpose of paying the costs of construction on another job. This will be elaborated later.

On October 1, 1954, respondent Century Indemnity Company filed its motion to intervene and attached its proposed intervening petition; in this motion it alleged that the money attached was a progress payment on another construction job of Fisher's for which it had executed a performance bond, and that it asserted a right to the fund by assignment and by equitable lien, Fisher having defaulted in the payment of claims for labor and material. This motion for leave to intervene was sustained, over plaintiff's objection; thereafter an amended intervening petition was filed by leave, to which plaintiff filed its motion to dismiss and to set aside the original order permitting the intervention, on the ground that such amended petition did not state facts on which relief could be granted. That objection is preserved here, and it will be

necessary to outline, briefly, the intervenor's claim; copies of pertinent documents were attached to the amended intervening petition as exhibits. Plaintiff, by answer, denied all substantive allegations of the amended intervening petition.

Fisher had, on March 2, 1954, entered into a contract with Laclede Electric Co-operative for the construction of a sub-office building at Waynesville, Missouri; the intervenor, whom we shall usually refer to as Century, executed the performance bond on that job, taking a written application and indemnity agreement; Fisher agreed to indemnify and save Century harmless from all loss and damages. Other provisions of the bond and application will be referred to in the course of this opinion. The contract provided for "progress" payments as the work progressed, upon approval of the architect, and also for the retention by Laclede of 10% of the amount computed as due upon each payment until final completion and proof of the payment of all claims. The second progress payment so made was $8,878.50, and this (less a small withdrawal) constituted the fund attached. The check of Laclede was drawn to the order of "H. R. Fisher, General Contractor." With that payment Fisher opened a new account in the State Bank of Lebanon; he was introduced there by Mr. J. W. Haugh, General Manager of Laclede, but the account was opened and maintained merely in Fisher's name, with no restrictions on the bank's records. Mr. Haugh testified that he "wouldn't feel we had any right to put any restrictions on the payment, unless there was a violation of the contract that covered it." It was and is intervenor's claim that this money constituted, in effect, a trust fund for the payment of claims on the Laclede job and that it obtained, on Fisher's default, a prior equity and superior claim thereto, which related back to the date of its bond. It is agreed that Fisher defaulted in the payment of claims on the Laclede job also; that Century paid claims for labor and material

totaling $14,163.12 (although it is not shown how much it received from Laclede), and that on the date of the present attachment (May 26, 1954) Fisher owed more than $10,000 in claims for labor and material furnished on the Laclede job. Fisher completed the construction of the Laclede building. Century took assignments of claims from the creditors whom it paid, beginning in October, 1954. No formal or declared default on this job was shown. Century also claimed considerable expense, but that is immaterial here, since the amounts paid by it on claims exceeded the amount of the deposit.

Plaintiff had originally filed in the same court its suit by attachment on May 11, 1954, but on motion of the defendant that attachment was dissolved on May 26, 1954; on the same day this suit was filed. The file in the former case was received in evidence.

At the trial it was agreed that the court should consider the issues in the following order: (a) the validity of the attachment; (b) plaintiff's claims against defendant Fisher; and (c) the merits of the controversy between plaintiff and the intervenor. At the conclusion of all the evidence, the case was taken under advisement; on February 16, 1956, the court entered judgment finding that Fisher was a nonresident of Missouri, sustaining the attachment on that ground only and finding against the other two grounds alleged, finding the issues for plaintiff on the merits as against defendant Fisher and assessing its recovery at $11,876.56, with interest, and finding the issues for the intervenor and against plaintiff on the intervention; the clerk was ordered to pay the deposit of $8,593.62 to the intervenor. In so ruling, the court found that the intervenor had "an equitable lien and prior and superior claim and right" to the fund and its judgment established such lien and right. An after-trial motion for judgment, or for new trial, was filed by plaintiff; we need not digest it here, for it sufficiently raised plaintiff's present contentions; plaintiff also filed its excep-

tions to the failure of the court to sustain the attachment on all the grounds alleged. Defendant Fisher filed his motion for a new trial or to amend the judgment so as to find the issues for defendant, and, among other allegations, he asserted error in sustaining the attachment. All such motions were overruled. Plaintiff filed notice of appeal from "that part of the judgment finding that plaintiff proved only the ground of non-residence under the attachment issue * * *," and, generally, from the judgment in favor of the intervenor and against plaintiff on the merits. Defendant Fisher filed notice of appeal from the judgment and order sustaining the attachment and assessing plaintiff's recovery against defendant in the sum of $11,876.56. Defendant's appeal originally involved both the attachment issue and the merits of the final judgment against him.

After these appeals were taken, plaintiff and defendant stipulated that the personal judgment against defendant in the sum of $11,876.56, with interest and costs, should be final, that "no appeal will be taken from that portion of said judgment," but that defendant did not waive his right to appeal from the finding on the attachment issue, nor the plaintiff its rights on the issues found for the intervenor.

■ The questions now presented, though expressed in a multitude of forms, divide themselves into two categories, as follows: (1) was the attachment valid and properly sustained; and (2), did Century have a superior right and claim to the fund? We have determined that no appeal is properly before us on the attachment issue. The intervenor took no appeal, the judgment being in its favor. Plaintiff attempted to appeal from the failure of the court to sustain its second and third grounds for attachment, although the judgment and order of the court sustained the attachment. Under these circumstances we hold that plaintiff was not a party aggrieved by the judgment, in so far as the attachment issue was concerned, within the meaning of § 512.020 (all statutory references are to RSMo 1949 and V.A.M.S., unless otherwise stated). The judgment on this issue was in its favor, and it may not appeal merely because of the reasons given or not given for a favorable judgment. If a proper appeal on this issue were before us, and it should be determined that the trial court erred in sustaining the attachment on the ground of nonresidence, then we might, conceivably, consider the sufficiency of the proof of the other grounds to sustain the order and judgment. But that is not the case now here.

Defendant, as stated, appealed originally both from the order and judgment sustaining the attachment and from the judgment against him on the merits; later, by express stipulation, he waived his appeal from the judgment on the merits and agreed that it should be final. Thereafter he has been, and now is, attempting to appeal only on the attachment issue. Section 521.420 provides for the proceedings and burden of proof on attachment issues, judgment thereon and exceptions thereto, and for a trial on the merits thereafter; this statute further provides, in part: "2. Upon the trial of the case upon the merits, either party may appeal, the plaintiff from the finding on the plea in abatement, or on the merits, as he may elect, or both; the defendant, if at all, on the whole case, either party giving such bond for that purpose as the court may require; * * *." It seems obvious that the legislature intended that the defendant could only appeal after final judgment on the merits, and then on *both* the attachment issue and the merits; he was given no election. In Osborne & Co. v. Farmers' Machine Co., 114 Mo. 579, 21 S.W. 837, the court held (under a statute not so clear in its prohibition of defendant's right of appeal on the attachment issue alone) that where the defendant had not taken an appeal on the merits it would not be heard upon an appeal from the judgment sustaining the attachment; the court said that " * * * this was absolutely necessary in order to get the case before

this court for review of the trial and judgment on the plea in abatement. * * *." The court noted the distinction made in the statute, namely, that plaintiff might appeal on the attachment issue and judgment alone, but that it contained no provision authorizing the defendant to do so. See, also, Houchin v. Turner, 178 Mo.App. 314, 165 S.W. 1133, reaffirming the doctrine; in Mathewson v. Larson-Myers Co., Mo.App., 209 S.W. 294, loc. cit. 295, the court said: "Another matter forces itself on our attention. The defendant cannot appeal separately from the judgment on the plea in abatement. He must await a final disposition of the case on the merits and appeal, 'if at all, on the whole case.' Section 2335, R.S.1909." In the recent case of Mengwasser v. Tackitt, Mo.App., 280 S.W. .2d 433, 439, it was held that § 521.420 was not modified or supplanted by the Code of Civil Procedure, and the court quoted with approval from the opinion in Schafer v. Roberts, 166 Mo.App. 68, 148 S.W. 393, defining the rights of appeal and stating that the defendant may appeal "if at all, on the whole case."

■ While counsel have not mentioned it, the 1955 Legislature substituted a new § 521.420 for the one of the same number just discussed. It became effective on August 29, 1955, and was, therefore, in effect at the time of trial (December 2, 1955) and thereafter. We need not quote from, or discuss, the new section in detail; it, and the section immediately preceding, contemplate a verified motion to dissolve an attachment (in lieu of a plea in abatement), a trial of the issues thereon, and an order sustaining or overruling the motion; and thereafter, a trial on the merits and a final judgment in which there shall be incorporated a finding and judgment sustaining or dissolving the attachment; it is further provided that either party "may appeal from the judgment * * *." Certainly this statute does not authorize a defendant to appeal on the attachment issue and judgment alone, whatever may be its effect on the pre-existing rights of a plaintiff.

■ We hold that defendant has lost the right of appeal on the attachment issue by expressly waiving his appeal from the judgment on the merits. This precludes us from considering the various and sundry attacks made by defendant and the intervenor on the validity of the attachment (if indeed the intervenor may properly attack the attachment, Scott v. Levan, Mo.App., 286 S. W. 407), as, for instance, that plaintiff's claim was contingent and not yet due and that its suit was one of an equitable nature in which an attachment would not lie; and the same is true of plaintiff's contentions that the objections to the attachment were not properly raised by pleadings and thereafter preserved. The finding of the court on the question of nonresidence is not even briefed as error by the defendant.

■ We shall proceed now to the substantive question remaining on the merits —namely, who, as between plaintiff and the intervenor, is entitled to the fund? Since the case was tried by the court upon the facts without a jury (§ 510.310), we review the case here as one of an equitable nature, and should not set aside the judgment unless clearly erroneous. Gabel-Lockhart Co. v. Gabel, 360 Mo. 518, 229 S.W.2d 539. The intervening petition is clearly of an equitable nature seeking to establish, as it does, an equitable lien on the fund; plaintiff, of course, contends that its claim is strictly a law action. However, no objection was made to the intervening petition on this ground, and there seems to be no inherent objection to such procedure, at least where a jury is waived on the whole case. See, by analogy, the counterclaim statute, § 509.420; City of Caruthersville v. Cantrell, Mo.App., 230 S. W.2d 160. The filing of the intervening petition and amended intervening petition was properly permitted under § 507.090, whether as of right or as permissive only. As stated in Vol. 1, Carr Missouri Civil Procedure, § 70, p. 227, this section should be liberally construed, in accordance with the general spirit of the code. And see, generally, on intervention, State ex rel.

Duggan v. Kirkwood, 357 Mo. 325, 208 S. W.2d 257, 2 A.L.R.2d 216. We hold also that, under the rule of liberal construction of pleadings, the motion to dismiss the amended intervening petition was properly overruled.

It will be impossible to consider here, specifically, all the points and subpoints raised by counsel. It will also be impossible to discuss all the cases cited. We shall attempt to incorporate the substance of the points and the cases into our discussion of the fundamental principles involved. Generally, the intervenor contends that, by virtue of Laclede's contract with Fisher, the latter's indemnity agreement with it, and its performance bond, plus its payment of claims, it had and has an equitable lien on and a superior right to this fund, relating back to the date of its bond: (1) by right of subrogation to the rights of Laclede and Fisher and because the fund was the "very money" for the security of which it was bound; (2) by assignment to it of such moneys in the indemnity agreement, considered either as an independent ground of recovery or as a recognition of the general right of subrogation; (3) that plaintiff attached with knowledge of the source of this fund and of "the terms of Fisher's construction contract," and with knowledge that Fisher was "insolvent"; and that by reason thereof plaintiff was properly subordinated to intervenor's claim; and (4) by a specific subrogation to, and assignments of, the rights of all suppliers of labor and materials whom it paid, and who had prior claims on the fund superior to that of the contractor.

The plaintiff (appellant) submits: (1) that this money, constituting as it did the second "progress payment" on the Laclede job, was paid generally and without restriction to Fisher, the contractor, and that it became and remained a part of his general assets, subject to no lien and thus subject to attachment; (2) that the Laclede contract did not provide otherwise, but that, in any event, it would not be binding on plaintiff who was not a party; (3) that

Century's bond application gave it no effective assignment of this money, at least as against plaintiff; (4) that plaintiff had no such actual or constructive knowledge as would affect its rights; (5) that labor and material claimants had no right in or lien upon this fund and that neither assignments from them nor subrogation to their rights can aid intervenor. Other elements of the contentions of the parties will be demonstrated as we discuss the authorities.

At this point it is necessary to note certain provisions of the construction contract, the bond application of Fisher, and the bond itself, all referred to by Century as the "contract documents." The bond is said to be required by 40 U.S.C.A., § 270a, but we think that the statute, otherwise, has no bearing on this case. We may assume that, as between Laclede, Fisher, and Century, the three documents listed above should be considered together. As to third persons, such may or may not be the case. The construction contract, executed February 19, 1954 (total contract price $25,300), provided: that partial payments of 90% of the construction accomplished during the preceding calendar month should be made on or before the 15th of the month, on the basis of estimates certified by the contractor (bidder) and approved by the architect, 10% being retained until completion, inspection, certification and release of all lien rights; that no payments should be due while the bidder (contractor) was in default; that on default and notice the owner might take over the construction. The "General Conditions," appearing as a separate but attached document, provided: that the architect might withhold or nullify any certificate for payment upon failure of the contractor to make payments properly to subcontractors or for material or labor and for other reasons; that the contractor agreed to pay to subcontractor, upon payment of certificates (if issued under a Schedule of Values), such part of the amount allowed to him as represented the subcontractor's work and interest therein, or to pay the subcontractor (if a cer-

tificate was issued otherwise) so that his total payments should be as large in proportion to the value of his work as the amount certified to the contractor was to the value of his completed work. The bond of Century ran to Laclede and the United States, and to and for the benefit of all persons who should furnish materials or labor on the job; it was conditioned that the contractor should well and fully perform the contract, indemnify Laclede for all loss and damage, and that he should promptly pay all claims for labor and materials on the project. The application of Fisher for this bond, including his indemnity agreement, contained a general agreement to indemnify Century against loss and damage, and further provided that Century, " * * as surety on said bond, as of this date, shall be subrogated to all rights, privileges and properties of the indemnitor in said contract, and said indemnitor do [sic] hereby assign, transfer and convey to said Company all the deferred payments and retained percentages arising out of this contract, and any and all monies and properties that may be due and payable to said indemnitor and the balance of the contract price remaining unpaid at the time of the happening of any of the occurrences mentioned in the first paragraph of the next preceding section, * * *." (which in substance referred to acts constituting a default under the contract).

On the general proposition that Century had an equitable lien on this fund by subrogation and by virtue of its contract liability and the payments made by it, counsel cite: Prairie State Nat. Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547; Hardaway v. National Surety Co., 211 U.S. 552, 29 S.Ct. 202, 53 L.Ed. 321; Massachusetts Bonding & Ins. Co. v. Ripley County Bank, 208 Mo.App. 560, 237 S.W. 182; Sipes v. Ardmore Book & News Co., 138 Okl. 180, 280 P. 805; Merchants' Insurance Co. v.

Herber, 68 Minn. 420, 71 N.W. 624; Maryland Casualty Co. v. Dupree, 223 Ala. 420, 136 So. 811; Farmers' Bank v. Hayes, 6 Cir., 58 F.2d 34; Exchange State Bank v. Federal Surety Co., 8 Cir., 28 F.2d 485; Lacy v. Maryland Casualty Co., 4 Cir., 32 F.2d 48; United States Fidelity & Guaranty Co. v. Sweeney, 8 Cir., 80 F.2d 235. These citations are apparently intended also to comprehend the contention that this was the "very money" secured by Century. In general, these cases hold that a surety which executes a performance bond on a construction contract, and which thereafter is required to pay unpaid labor or material claims, has an equitable right of subrogation and an equitable lien on funds *retained* by the owner or obligee which is superior to the right of one who takes by assignment from the contractor after the execution of the bond; and it is thus held that the surety's equitable lien relates back to the date of its bond. The gist of these cases seems to be that the surety is subrogated to the rights of the owner or obligee, who could, on default, continue to retain funds which it had not paid to the contractor, forfeit his right thereto, and apply them to the payment of claims on the job. In most of these cases the money was still in the hands of the owner or obligee. Prairie, Henningsen, Hardaway, Exchange State Bank, Farmers' Bank. In others the fund had been placed by the surety under joint control, such amounting in a sense, to an appropriation by the surety (United States Fidelity & Guaranty Co. v. Sweeney, Lacy). The case of Lincoln County v. E. I. Du Pont De Nemours & Co., 224 Mo. App. 1183, 32 S.W.2d 292, not cited, involved a percentage retained by the county until after the controversy arose, when it was paid into court by way of interpleader. The Dupree case, supra, was a suit on a contractor's bond and the surety was allowed a credit for payments applied by a creditor-materialman upon prior or collateral indebtedness; certain of the authorities there relied on do not, we think, support the decision.

The Sipes and Herber cases, supra, neither of which involved a surety on a construction bond, are relied on as upholding the surety's equity where the money, although paid out, is the "very money" which the "surety is obligated * * * to pay." The Sipes case involved sales on consignment and the application to prior indebtedness of proceeds received during a period covered by a bond; the court held that the money in question, being the money for which the surety had become liable, could not thus be diverted; however, the case has been distinguished on its facts in a later Oklahoma case which certainly does not favor the intervenor's position here. Metropolitan Cas. Ins. Co. v. United Brick & Tile Co., 167 Okl. 402, 29 P.2d 771. Such is also true of the Herber case, supra. See, Standard Oil Co. v. Day, 161 Minn. 281, 201 N.W. 410, 41 A.L.R. 1291. The case of Wait v. Homestead Bldg. Ass'n, 81 W. Va. 702, 95 S.E. 203, 206, 21 A.L.R. 696, cited as requiring the court to make application of a fund paid in, according to "justice and equity," is so wholly different on the facts that it hardly merits discussion. We shall discuss the case of Massachusetts Bonding & Ins. Co. v. Ripley County Bank, supra, in a separate discussion of the Missouri authorities, later.

We agree with counsel for Century that the equitable lien through subrogation may attach to progress payments earned, as well as to a specifically retained percentage, under some circumstances; but this is only true, we think, if the progress payment has actually been retained by the owner or obligee, or placed under the control (or joint control) of the surety. While very general language is used in some of the foregoing cases, we do not believe that, considered on their actual facts, they stand for a broader rule. Certain cases specifically seem to base the lien upon the fact that funds, though earned, have been retained. Lacy v. Maryland Casualty Co., 4 Cir., 32 F.2d 48; First National Bank of Seattle v. City Trust Safe Deposit &

Surety Co., 9 Cir., 114 F. 529; Farmers' Bank v. Hayes, 6 Cir., 58 F.2d 34.

On the other hand there are many cases which hold that where money has been earned by and paid to a contractor upon a construction contract, and he has, in turn, paid sums therefrom to a materialman or labor creditor of the job, the latter may, in the absence of specific directions, apply the money upon some prior or collateral indebtedness, and the surety cannot follow it or require a different application. This is so held upon the theory that money paid to the contractor, for work accomplished, and without restrictions, becomes his money to do with as he pleases, and that to fetter such funds with hidden liens or incumbrances would be an unwarranted restriction upon commercial business. To this effect see: Standard Oil Co. v. Day, 161 Minn. 281, 201 N.W. 410, 41 A.L.R. 1291; Grover v. Board of Education, 102 N.J.Eq. 415, 141 A. 81; Radichel v. Federal Surety Co., 170 Minn. 92, 212 N.W. 171; Kane v. First National Bank, 5 Cir., 56 F.2d 534; Jefferson v. Church of St. Matthew, 41 Minn. 392, 43 N.W. 74; People, for use of Hirth v. Powers, 108 Mich. 339, 66 N.W. 215; State Bank of Wheatland v. Turpen, 47 Wyo. 284, 34 P.2d 1; Metropolitan Casualty Ins. Co. of New York v. United Brick & Tile Co., 167 Okl. 402, 29 P.2d 771; Salt Lake City v. O'Conner, 68 Utah 233, 249 P. 810, 49 A.L.R. 941; Bay Lumber Co. v. Pickering, 120 Cal.App. 163, 7 P.2d 371; Fidelity & Deposit Co. of Md. v. New York City Housing Authority, D.C.S.D.N.Y., 140 F.Supp. 298, 302; United States Fidelity & Guaranty Co. v. City of Pittsburg, 115 Kan. 740, 225 P. 83, 85; North Pacific Bank v. Pierce County, 24 Wash.2d 843, 167 P.2d 454, 459, 164 A.L.R. 602. Some of these opinions (Kane, Turpen, Salt Lake City) recognize the equity of the surety in *retained* money as distinguished from money paid, and thus distinguish cases such as Prairie State Nat. Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; and some of these cases note

also the fact that the surety may, if it feels insecure, protect itself by a joint control requirement whereby it may approve or countersign all checks; some regard the surety as a mere contingent creditor until it has actually paid the labor and material claims (which was not done here until October, 1954, and thereafter). In Kane v. First Nat. Bank, 5 Cir., 56 F.2d 534, money so paid to a contractor under a construction contract had been deposited by him in a general account as an ordinary deposit; when the bank learned of his insolvency it applied this, and other deposited funds, on its own indebtedness; the court held that under the circumstances the money belonged to the contractor, unincumbered by any trust, and that it might be so applied, free of any claimed equity of the surety; the court expressly distinguished the Prairie State Nat. Bank case, supra, as involving a retained fund. It is true that most of the cases in the group last cited involved some payment made by the contractor after he received the money, and it is upon this feature that the intervenor seeks to distinguish them. It is highly material, however, to note that most of these authorities seem to proceed upon the premise that the money, when paid unconditionally to the contractor, became his, to do with as he pleased. In this connection, we may consider an attachment by a general creditor as the equivalent of an assignment by the contractor as of that date, in the absence of bankruptcy proceedings; the attachment is involuntary, of course, but the attaching creditor stands in the relative position of a general creditor-assignee. And we cannot agree, as intervenor's counsel state (Br. 23), that this money had the "status of an unpaid sum" because Fisher, a party to the contract, still retained it. Had it been deposited in Laclede's name we would have a different case entirely. Certainly this was not a special deposit (Hershey v. Northern Trust Co., 342 Mo. 90, 112 S.W.2d 545, 548) and the fund was mingled in the bank's general assets. It might be pertinent to ask whether, if the bank had failed, Century could have maintained a preferred claim to this money upon its present theory. We need not decide that here, but we certainly doubt that it could.

Intervenor cites the following cases as holding that the deposit of the fund did not free it from the surety's equity: Guthrie v. Waite, 129 Mo.App. 587, 107 S.W. 1110; Fawkes v. Curtis, 133 Or. 20, 286 P. 981; Massachusetts Bonding & Ins. Co. v. Ripley County Bank, 208 Mo.App. 560, 237 S.W. 182; L. J. Mueller Furnace Co. v. Colvin, 146 Minn. 252, 178 N.W. 496; Maryland Casualty Co. v. Dupree, 223 Ala. 420, 136 So. 811. Some of these hold that if a payment is made from a particular fund it must be applied on a debt which is a lien on that fund (Fawkes, Mueller); we need not dispute that, but our question is,—was there a lien on this fund after it was paid and deposited? Another (Guthrie) holds that an attachment against a fund which a defendant does not own is ineffective. One (Dupree) involved the application of a payment and the right to a small sum remaining in the surety's hands; so far as we see, it did not concern or decide the legal effect of a deposit by the contractor.

We look briefly now at the Missouri authorities. None is precisely in point. In Massachusetts Bonding & Ins. Co. v. Ripley County Bank, 208 Mo.App. 560, 237 S.W. 182, 185, cited by intervenor, a contractor had borrowed money from a bank, agreeing orally to assign to it sums to be retained on a school building contract; he defaulted in the payment of various claims against the job and the surety paid these, yet the School Board paid a part of the retained percentage to the assignee bank, taking a bond from it for security. No question of a deposit by the contractor was involved. The surety sued the bank and recovered on the theory of a superior right by subrogation "in and to the funds which by the contract were required to be reserved as security for the payment of

unpaid bills * * *" (citing the Prairie State Nat. Bank, Henningsen and Hardaway cases, supra, which involved retained funds). Since the suit involved a percentage expressly required to be reserved under the contract as security, the court seems to have considered the payment to the bank as wrongful and, therefore, to be disregarded. The case may lend some support to intervenor, though probably distinguishable on its facts.

In Audrain County ex rel. and to Use of First Nat. Bank of Mexico v. Walker, 236 Mo.App. 627, 155 S.W.2d 251, cited by plaintiff, a bank had advanced money to the contractor on a county building; at least a portion of the money advanced was used in the performance of the contract. On default the bank sued the contractor and the surety, recovering judgment in the trial court. The judgment was reversed as to the surety, upon the theory that one lending money to the contractor was not an obligee by the very terms of the bond, and also because no breach of the construction contract had been pleaded or proven. To that extent the case is of no authority here. Two concurring opinions were filed, however, and Judge Anderson discussed at length some of the problems confronting us now; particularly, he discussed and analyzed the case of Camdenton Consolidated School Dist., etc., ex rel. W. H. Powell Lumber Co. v. New York Casualty Co., 340 Mo. 1070, 104 S.W.2d 319. There the lumber company had advanced money to the contractor for the payment of labor claims and had taken an assignment; it had also furnished material for the job; when it was paid by the contractor it applied the payment in satisfaction of its advances to him, and sued the surety on the bond for the materials it had furnished. The surety, of course, claimed that the money received by plaintiff from the building funds should have been applied to satisfy first its material claims, and not applied on its personal loan to the contractor. The court permitted a recovery

in full on the material claim. In discussing that case, Judge Anderson said in part (155 S.W.2d loc.cit. 261): "* * * The case merely held that a surety cannot, in the absence of a superior equity in his favor, insist upon the application by the principal and the creditor, or either of them, of the payments made by the principal out of funds derived from the construction contract, to the payment of claims covered by the bond. The court held that the surety in that case did not possess such superior equity." Judge Anderson further distinguished the Prairie State Nat. Bank, Massachusetts Bonding (discussed, supra) and Lincoln County v. E. I. Du Pont De Nemours & Co. cases as involving retained percentages reserved to secure final performance, where the surety would become subrogated to such funds; and he further said, 155 S.W.2d loc.cit. 261: "* * * The cases have no application to money not reserved as a security but paid over to the contractor. The better view seems to be that it is for the public interest, in the absence of agreement to the contrary, to permit such funds to be freely applied in the commercial world as the contractor may see fit. Under this view, such funds are not trust funds to secure the surety, who after all is but a contingent creditor." (Citing numerous cases.) In discussing the supposed equity of a surety, independent of contract, and the fact that our court had, in the Powell case, supposedly adopted the rule announced by the Minnesota cases, Judge Anderson further said (155 S.W.2d loc.cit. 265): "* * * I am, therefore, of the view that the Powell case can only stand for the proposition that where money is loaned to the contractor and is used to pay labor claims, the lender by reason of the assignment by the contractor of money due under the construction contract has an equity superior to the equity of the surety on the contractor's bond in the instalments paid under the construction contract prior to any default by the contractor, and that the lender by reason of this superior equity has a right to apply the instalment paid to

the liquidation of the loan. * * *." None of the Missouri cases is precisely in point here, but, as we read them, they seem inclined toward the view that when sums earned under the contract are paid generally to the contractor, such funds are thereby freed of any equity or right of subrogation in the surety. Under all the authorities considered we so hold, unless the remaining contentions of the intervenor change the situation.

We have previously discussed, to some extent, the contention that Century had a lien on the fund because this was the "very money" secured. The cases cited are, we think, distinguishable. Construing the indemnity agreement, the construction contract and the bond, we do not find that Fisher was required (at least in this instance) to pay the claims out of any particular fund, but merely that he was required to pay promptly all claims for labor and material, and to pay subcontractors in the same proportion as he had received payments. The record does not show which of the claims paid by Century were paid to those who actually were "subcontractors," but this is immaterial. Subparagraph (e) of Art. 37 of the General Provisions of the contract was applicable where progress payments were made pursuant to a "Schedule of Values"; no "Schedule of Values" appears in the record with regard to this payment, but rather an "estimate." We cannot say, therefore, that the payment now in question was made pursuant to a "Schedule of Values" or that subparagraph (e), supra, was applicable. Subparagraph (f) was applicable where certificates were issued and payments made "otherwise than as in (e)," and would seem to be applicable here. That subparagraph merely required the contractor "To pay the Subcontractor, * * * so that at all times his total payments shall be as large in proportion to the value of the work done by him as the total amount certified to the Contractor is to the value of the work done by him." We do not construe this provision as fixing on the contractor an obligation to pay out of any specific money, or as fixing any trust upon the funds themselves, at least after money had been released generally to the contractor. Were our construction of the above contract provisions otherwise there would still remain a serious question as to whether such provisions could be of any effect as against a stranger to the contract. And there is authority to the effect that a promise to pay out of a specific fund, if shown, is not an assignment of a right in that fund, even in equity, where the promisor does not relinquish all control. Christmas v. Russell, 14 Wall. 69, 84, 81 U.S. 69, 84, 20 L.Ed. 762; In re Thikoll's Estate, 12 Ill.App.2d 474, 139 N.E.2d 824.

The indemnity agreement assigned to Century all "deferred payments and retained percentages * * * and any and all monies and properties that may be due and payable * * * at the time * * * of any of the occurrences mentioned" in the first paragraph of the preceding section (which, in substance, referred to acts constituting a default). We hold that this assignment, by its very terms, did not cover moneys earned and paid generally to the contractor before default. Here the record shows no default, as such, on or prior to May 26, 1954; the stipulation of facts merely shows that Fisher then owed in excess of $10,000 for materials and labor on the job; we do not think that this alone proves a default within the meaning of the indemnity agreement; certainly the owner had taken no action under the rights and powers reserved in the contract to declare a default or to terminate Fisher's employment (Art. 22—General Conditions). The following cases lend support to our view concerning the ineffectiveness of this assignment under the circumstances: United States Fidelity & Guaranty Co. v. City of Pittsburg, 115 Kan. 740, 225 P. 83, 85; United States Fidelity & Guaranty Co. v. Armstrong, 225 Ala. 276, 142 So. 576; Fidelity & Deposit Co. of Maryland v. City of Auburn, 150 Wash. 114, 272 P. 34; North Pacific Bank v. Pierce County, 24 Wash.2d 843, 167 P.2d

454, 164 A.L.R. 602; Grover v. Board of Education, 102 N.J.Eq. 415, 141 A. 81; First Camden Nat. Bank v. Aetna Cas. Co., 3 Cir., 132 F.2d 114.

Intervenor insists that plaintiff had knowledge of the source of this money, "of the terms of Fisher's construction contract," and that Fisher was insolvent; also, that this should invalidate any attachment levy antagonistic to intervenor's equity. Various cases of those cited, do note the materiality of notice or knowledge (Grover, Turpen, Salt Lake City, North Pacific Bank and Dupree cases). But such cases, all or substantially all, involved the question of the application of payments by a materialman or by one who had actually advanced money on the very job in question; in other words, the knowledge or notice so considered was on the part of one who was more or less a party to the construction project, and perhaps thereby more subject to any equities inhering in a party thereto. Here plaintiff was a stranger, and certainly subject to no inhibitions arising out of the contract relationship. Moreover, plaintiff's right of attachment is strictly a legal right, and we are not actually dealing with a balancing of equities, where notice might be highly material. There is, as indicated in 6 Williston on Contracts (Rev.Ed.), § 1806, p. 5127, some conflict on the materiality of notice, even as concerns the materialmen, one line of cases holding that such notice is immaterial unless there is a "natural inference" that it would be a violation of duty to apply the payment to a different account; such a duty, it would seem, must arise from contract or from a fiduciary relation (id p. 5129). Plaintiff here was in no such position. The evidence creates a fair inference that plaintiff's representative who talked with Fisher concerning the Dixon job two or three times in April, 1954, and on May 1, learned independently of the existence of the Laclede job and asked Fisher why he had not been informed of it; he apparently learned then that there would soon be a progress payment of approximately eight or nine thousand dollars from the Laclede job;

there was no evidence that plaintiff, through this representative or otherwise, learned or knew of the "terms" of any of Fisher's contractual relations with Laclede or Century. As supporting its contention of knowledge, intervenor offered in evidence a "Summons to Garnishee" from the prior suit already referred to; there are two in that file and since the file, generally, was incorporated into the stipulation of facts, we shall mention both. One was to the State Bank of Lebanon, attaching credits and deposits of Fisher supposedly being in the approximate amount of $13,000; the other was directed to Laclede Electric Cooperative, attaching debts due to Fisher and particularly profits under contract for the construction of a substation, etc., "the amount of approximately $8,361.10 being owed * * *." The latter summons corroborates the fact that plaintiff had then (May 11, 1954) knowledge of Fisher's contract with Laclede and of the approximate amount of a progress payment then due or already paid; but this falls far short of showing that plaintiff knew the terms of the contract, bond and indemnity agreement, if such be material. And various cases hold that there is no duty, even on a materialman creditor, to investigate. Metropolitan Casualty Ins. Co. of New York v. United Brick & Tile Co., 167 Okl. 402, 29 P.2d 771, 776; Kane v. First Nat. Bank, 5 Cir., 56 F.2d 534, 535; Standard Oil Co. v. Day, 161 Minn. 281, 201 N.W. 410, 412, 41 A.L.R. 1291; American Lumbermans Mut. Cas. Co. of Illinois v. Bradley Const. Co., 127 N.J.Eq. 500, 13 A.2d 783, 785. Under the circumstances here we do not think that such knowledge or notice as plaintiff may have had affected the validity of its attachment. Particularly is this true where, as we have already indicated the unrestricted payment of the fund to Fisher freed it of any equity of Century.

█ Intervenor also claims a preferential right to the funds by subrogation to, and assignments from, the various labor and material claimants whom it paid. These payments were made and assignments exe-

cuted months after the attachment. We need not decide whether any rights so acquired would relate back. The very considerable weight of authority seems to be that in the absence of statute, labor and material suppliers have no lien or priority on any fund in the hands of the owner or contractor. Security Federal Savings & Loan Ass'n v. Underwood Coal & Supply Co., 245 Ala. 56, 16 So.2d 100; Fidelity & Deposit Co. of Md. v. New York Housing Authority, D.C.S.D.N.Y., 140 F.Supp. 298; Salt Lake City v. O'Connor, 68 Utah 233, 249 P. 810, 49 A.L.R. 941; United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022; In re Flotation Systems, Inc., D.C.Cal., 65 F.Supp. 698; Chicago Lbr. Co. v. Douglas, 89 Kan. 308, 131 P. 563, 44 L.R.A.,N.S., 843; Mack v. Colleran, 136 N.Y. 617, 32 N.E. 604. The principle should be more certainly applicable to a payment made to the contractor before default. A case apparently to the contrary (United States Fidelity & Guaranty Co. v. Sweeney, 8 Cir., 80 F.2d 235) based the right of the claimants upon the fact that a fund remained in the hands of the owner after completion of the work, with bills unpaid. In our case the fund had been unconditionally paid to the contractor. We hold that the intervenor had no lien through this source which would invalidate the attachment.

■ We do not consider it necessary to discuss any additional points. After much consideration we have determined that plaintiff's attachment was valid and superior to any rights of the intervenor. That part of the judgment sustaining the attachment is affirmed; the judgment in favor of plaintiff and against defendant Fisher is affirmed in accordance with the stipulation of the parties; the findings and judgment in favor of intervenor and against plaintiff and the order upon the clerk to pay the sum of $8,593.62 to the intervenor is hereby reversed and set aside; the cause is remanded with directions to enter a new judgment in accordance with the views indicated herein.

## Supplemental Opinion

## PER CURIAM.

Upon the granting of rehearings this cause was transferred to the Court En Banc where it has been reargued, briefed and submitted. Rehearings were granted primarily to permit a consideration of the contention of the intervenor, Century Indemnity Company, that it should be granted the right to question the validity of the attachment. That question has now been considered. All parties have filed supplemental briefs.

■ We adhere to the ruling that defendant Fisher's appeal did not bring up for decision the propriety of the trial court's order and judgment sustaining the attachment. The matter is fully discussed in the divisional opinion and nothing need be added here. We have further determined that the intervenor will not now be permitted to contest the validity of the attachment. It is not necessary for us to decide whether an intervenor may, in any event, question the validity of the attachment of money or property which he claims. In the present case the petition in attachment was filed on May 26, 1954, and the writ was executed on the same day; on October 1, 1954, Century Indemnity Company was given leave to, and did, intervene. In its First Amended Petition, filed December 15, 1954, Century made various references to the "attached" sum and fund, alleged its prior and superior right to and lien thereon, but in nowise pleaded any claim of invalidity in the attachment. This was substantially conceded here in the oral argument. The issues on the attachment were raised by motion and answer of defendant Fisher. We have reviewed the pertinent parts of the transcript; at the beginning of and throughout the trial it was intervenor's theory that it had a superior right to and lien on the attached fund; its counsel did suggest at the outset that it would have the right to "at least call the court's attention" to the law on the attachment question, and at one point he declined to renounce the

**348**

"right to question" the attachment. The record as a whole, however, fairly shows that it was recognized that the validity of the attachment was an issue between plaintiff and the defendant. During the hearing of evidence counsel for intervenor insisted at various times that it be made clear that evidence being offered on the attachment issue was not to affect the issue between plaintiff and the intervenor, as, for instance: "Mr. Keet: We offer it at this time into evidence on the attachment issues, the deposition given by Mr. Snyder N. Craig of Mansfield, Missouri, on this date. Mr. Miller: I understand it is not to be considered then as between or as bearing upon or for any purpose as between plaintiff and intervener? Mr. Keet: That's right." We do not find that the intervenor took any part in the trial of the attachment issue, but on the other hand, insisted that its own issues should in no way be prejudiced by that controversy. We conclude that neither by its pleadings nor its trial theory did intervenor make any issue on the validity of the attachment, and that there is no reason to broaden and confuse the issues at this late date. Apparently intervenor was willing to let the defendant carry the laboring oar until this court held that defendant's appeal was not sufficient to raise the attachment issue here. It will thus be unnecessary to discuss those cited cases which have some possible bearing on the right of an intervenor to question an attachment generally.

The intervenor argues here that it may now urge, as respondent, any theory valid in law to uphold its judgment, citing among other cases: Kirchner v. Farmers' Mutual Fire Ins. Co., Mo.App., 267 S.W.2d 390; Burnett v. Western Union Tel. Co., 39 Mo. App. 599, and Gulf, Mobile & Ohio R. Co. v. Williamson, Cir., 191 F.2d 887. The difficulty with that argument here is that two distinct issues were ruled by the trial court: (1) the attachment, and (2) the merits of intervenor's claim to a superior right and lien. If the intervenor should be considered, for any purpose, as a party to the first issue and judgment, nevertheless the finding and judgment thereon were adverse to the position which it now assumes; it may not, by lumping that issue with the trial court's finding and judgment on the merits, come here as the winning party (and respondent) on the attachment issues.

The merits of intervenor's claim have been briefed and argued again at length. We adhere to the divisional ruling. The opinion of Division Two herein, as supplemented by this Per Curiam, is adopted as the opinion of the Court En Banc.

All concur.