424 P.2d 154

**STANDARD ACCIDENT INSURANCE CO.,**
a Michigan corporation, Appellant,

**v.**

**COPPER HILLS MOTOR HOTELS, INC.,**
an Arizona corporation, Appellee.

**No. 8694–PR.**

Supreme Court of Arizona.
Feb. 23, 1967.
Rehearing Denied April 19, 1967.

Jennings, Strouss, Salmon & Trask, Phoenix, for appellant.

Snell & Wilmer, Phoenix, for appellee

STRUCKMEYER, Justice.

This is an action by Copper Hills Motor Hotels, Inc., against Standard Accident Insurance Company on a bond executed to guarantee the payment of labor and materialmen liens. Judgment was entered in favor of Copper Hills. The Court of Appeals reversed. Opinion of the Court of Appeals vacated and judgment affirmed.

In 1960 and prior thereto, Copper Hills owned and operated a motel near Miami, Arizona. Peter J. Wurts was its president and general manager. Wurts was a friend of William G. Spurr, president of Paramount Builders, Inc., a construction company. Spurr was authorized by Paramount Builders to borrow money for the corporation and in the past had borrowed money on its behalf from Wurts. In May of 1960, Spurr discussed with Wurts the possibility of borrowing money for Paramount. These discussions culminated on May 31 in Wurts and Spurr borrowing $10,000 from the First National Bank of Arizona. They cosigned a demand note and the money was placed to the credit of Paramount.

Thereafter, on July 1, 1960, Paramount entered into a construction contract with Copper Hills to build a twelve-unit addition to its motel. Paramount secured a performance bond from Standard Accident Insurance Company to indemnify Copper Hills against any loss suffered by reason of Paramount's failure to perform the construction contract. At this time Paramount was engaged in other construction jobs in Arizona, including at least one subdivision development.

By the terms of the construction contract Paramount was entitled to receive progress payments at stated intervals as portions of the work were completed. Three payments were made by Copper Hills pursuant to the contract. Before the fourth payment was made, Wurts asked that the $7,000 due on the contract be applied by Paramount toward the $10,000 indebtedness to the bank. Spurr suggested that Paramount be allowed to retain part for current expenses. Accordingly, on August 22, 1960, the $7,000 was disbursed in this manner: Two checks were drawn by Copper Hills made payable to Paramount, one for $3,846.67 was kept by Paramount, the other for $3,153.33 was endorsed by Paramount to Wurts, Spurr as president signing for Paramount. Thereafter, in the middle of September, when the fifth and final payment became due, Copper Hills, with the consent and authorization of Spurr acting for Paramount, paid directly to Wurts by two checks the sum of $3,024.75 and, in addition, satisfied on its books a $2,000 loan from Copper Hills to Wurts. It was stipulated that by these transactions the indebtedness of Spurr and Wurts to the First National Bank of Arizona was reduced by $8,010.

About October 1, 1960, Paramount Builders ceased operations and on December 28, 1960, filed a petition in bankruptcy. Labor and material liens were filed against the Copper Hills property totaling $26,041.94. Standard Accident paid the liens except for the amount which Wurts had received from Paramount. Copper Hills paid the balance and brought suit on the bond against Standard Accident for the difference.

The uncontroverted facts disclose that Paramount Builders was not in default to laborers or materialmen on the Copper Hills job at the time of the payments in question, although it was on other jobs, and that neither Copper Hills nor any of its officers or employees, including Wurts, knew that Paramount was in default on other jobs. Moreover, neither the construction contract nor the bond directed the priority of payments or imposed any responsibility upon Paramount or Copper Hills to apply funds held or received by either in any manner other than that Copper Hills was to make the progressive payments as noted above.

At the common law an insolvent debtor could prefer one debt or creditor over another. Grandison v. Robertson, 2

Cir., 231 F. 785. The principle is discussed in a standard compilation in this language:

"It is a well-settled rule that subject to certain limitations, an insolvent debtor [here, Paramount] may, in the absence of either federal or state statute on the question, arbitrarily select one or more of his creditors and pay them in full, even though by such payment he thereby disables himself from paying his other debts. Neither his assignee in insolvency nor his creditors can object because he has delivered his funds to one of his creditors in preference to an equitable division among all of them. The right of a debtor to give a preference springs from his ownership and his dominion over his property, and if he acts in good faith, pays an honest debt, and reserves no advantage to himself, the payment is valid. The right of a creditor [Wurts] to secure himself, to obtain payment of a just debt by activity and vigilance, is not affected by the debtor's insolvency, or his knowledge of it, or by the fact that by securing himself he defeats another. He is not bound to protect other creditors; if he merely obtains what is due him, there cannot be said to be fraud in the transaction." 29 Am.Jur., Insolvency, 354, 355.

It has been recognized in Arizona that:

" * * * there is no rule against a failing debtor preferring one creditor over another, except where such preference is declared void by a bankruptcy statute or other of similar nature." Williams v. Earhart, 34 Ariz. 565, 573, 273 P. 728, 730.

Moreover we have said:

"It is well settled that a debtor who makes a payment has a right to direct how the payment shall be applied. * * * Neither sureties nor guarantors have the right to control the application which either the debtor or the creditor makes of the payment." Valley National Bank v. Shumway, 63 Ariz. 490, 497, 163 P.2d 676, 679.

■ Standard concedes that ordinarily, in the absence of an agreement, a surety cannot direct or control the application of payments made by its principal to third persons, creditors of the contractor. However, it is urged that a surety has a special equity where payments are made with funds which are the proceeds of the contract, the performance of which the surety guarantees, and that this requires the obligee to control the application of payments to the contractor.

The end result of Standard's argument would be to cast a duty upon the obligee of a bond to protect a surety against losses where a contractor prefers creditors other than those furnishing labor and material to the bonded job. An obligee on a bond could do this only by refusing to honor assignments of the contractor and by refusing to make payments to a contractor unless a system of controls was set up ensuring that the payments would be passed on in full to laborers or materialmen on the job. This arrangement would necessarily be required, for a contractor having a number of jobs under construction at the same time obviously would not ordinarily apply the particular funds received in the course of construction to the job from which the funds were derived.

■ It is apparent that the principle for which Standard contends imposes responsibilities and liabilities on an obligee of a bond as great as if no bond had been required. The owner who requires a bond does so to protect himself against the insolvency of his contractor. If the owner must withhold funds due a contractor, under penalty of being liable to the surety, until subcontractors and laborers and materialmen have been satisfied, the surety has shifted back upon the owner the ultimate legal responsibility against which the owner required the bond in the first instance.

Standard cites no authority or precedent supporting the theory it seeks to invoke. It is urged by analogy that the principles stated in the annotation to Mid-Continental Supply Co. v. Atkins, 10 Cir., 229 F.2d 68, 57 A.L.R.2d 849, (Application of payments

as between debts for which a surety or guarantor is bound and those for which he is not) recognized in the Restatement of Contracts, §§ 387, 388, and by this Court in Webb v. Crane Co., 52 Ariz. 299, 80 P. 2d 698, 699, should be dispositive of the issues here. We do not think so.

We do not consider it possible or necessary to review all the authorities cited and within the scope of that annotation, but as a generality it may be observed that the cases in the main are directed to the factual situation in which the contractor, after receiving payments from the owner, pays a laborer or materialman to whom the contractor is indebted on two or more accounts or jobs. The annotation states that the general rule permits, *in the absence of agreement or superior equity*, the application of the payment to either of the accounts and the right to apply it to either is not affected by the fact that a surety or guarantor is liable for one or the other of the debts. It then examines those cases in which superior equities either were found or not found to exist. Such cases, obviously, are not precedent where, as here, the contractor has either received the money due him and thereafter disburses it to his creditors or assigns the fund while it is still in the hands of the owner.

. Webb v. Crane Company, supra, heavily relied on by Standard, is such a case. There the Webb Company paid its subcontractor who in turn paid the Crane Company, a materialman. The Crane Company applied the payment to an account which it had with the subcontractor on another than Webb Company job. The decision was turned upon the line of cases which holds that a materialman may not, where he knows the source of the payment, use it to discharge the debt of another. The principle was specifically adopted because were it otherwise an owner, by reason of the Arizona materialmen's lien laws, would be put in the position of having to discharge the materialman's debt twice. The rights of a surety were not discussed

and so far as the decision discloses were not an issue in the case.

More on point is such a case as National Surety Corporation v. Fisher, Century Indem. Co. (Mo.), 317 S.W.2d 334. There, National Surety instituted suit against Fisher, the contractor, and garnisheed a deposit in a bank standing in his name. Century Indemnity Company intervened, asserting that the money on deposit was a progress payment from another construction job of Fisher's for which it, Century, had executed a performance bond and that it had a right in equity to the fund. In an extensive analysis of the contentions made, many of the arguments advanced here were considered. The Missouri Supreme Court reversed the trial court which found in favor of Century, the intervenor, and directed that a judgment be entered in favor of National Surety. The court stated:

"We agree with counsel for Century that the equitable lien through subrogation may attach to progress payments earned, as well as to a specifically retained percentage, under some circumstances; but this is only true, we think, if the progress payment has actually been retained by the owner or obligee, or placed under the control (or joint control) of the surety. While very general language is used in some of the foregoing cases, we do not believe that, considered on their actual facts, they stand for a broader rule." 317 S.W.2d 334, 342.

The court further commented that:

" * * * money paid to the contractor, for work accomplished, and without restrictions, becomes his money to do with as he pleases, and that to fetter such funds with hidden liens or incumbrances would be an unwarranted restriction upon commercial business." 317 S.W.2d 334, 342.

■ In State Bank of Wheatland v. Turpen, 47 Wyo. 284, 34 P.2d 1, where the State Bank took an assignment of claims from materialmen against a contractor, both

for money advanced in payment of such claims and for other claims against a contractor, the bank was held to be entitled to the funds as against the surety. We think the reasons for the holding are applicable to this case:

"The principles of natural justice and equity must necessarily be interpreted in the light of, and depend upon, the actual and existing human factors which confront us. The argument that the surety pays under compulsion, and that a banker is a mere volunteer, should not be carried too far, for the broad principle of equity to which the surety appeals might be thwarted rather than applied. In fact, if counsel's broad argument is correct, and we should hold as contended, namely, that the fund in question is a trust fund which must be preserved in favor of the surety at all hazards, we might as well be frank and hold that when banks undertake to assist contractors, they, in the main, merely become aids for the relief of sureties. That would ultimately, of course, either compel sureties to engage in financing contractors, or construction contracts would be let only to persons or associations with ample financial means to carry on their work independent of any financial help. It may be that, economically, this would be a desirable result. But courts do not exist for the purpose of shaping economic forces, and we must deal with situations as we find them. At the present time, as pointed out in Standard Oil Co. v. Day, 161 Minn. 281, 201 N.W. 410, 412, 41 A.L.R. 1291, most contractors must necessarily use some of the money which they receive under contracts in payment of their general obligations. And few are able to carry out a contract of any size without financial support.

\*  \*  \*  \*  \*  \*

"For the reasons pointed out, and others, a number of the courts have seen no justification in holding that a surety has an equitable lien on funds like those involved herein, at least after it has been paid out, and have believed it to be for the public interest, *in the absence of a contract to the contrary*, to permit such funds to be freely applied in the commercial world as the contractor may see fit." 47 Wyo. 284, 34 P.2d 1, 11, 12. (Emphasis supplied.)

The case of American Surety Co. v. Plank & Whitsett, 159 Va. 1, 165 S.E. 660, is clearly distinguishable on its facts. The court stated:

"\* \* \* the owners failed to show that they had complied with the terms of the agreement, and hence the surety was released from its obligation to them."

Standard suggests that the bond and the construction contract when read together imposes a duty on Copper Hills to refuse to pay where it had knowledge that the funds would be used to pay general creditors. We do not so read those instruments.

Appellant urges that the authorities are unanimous in holding that good faith is required of the owner toward a surety. We find no fault with this statement. However, we do not believe that there is a want of good faith where the parties have done no more than that which is their legal right. Nor do we think a surety should be able to require of its obligee a greater duty than it can require of its principal, or choose to require of its principal in the written undertaking.

Judgment affirmed.

BERNSTEIN, C. J., McFARLAND, V. C. J., and UDALL, J., concur.

LOCKWOOD, J., dissents.